Daniel E. Witte, # 08576                          (SPACE BELOW FOR FILING STAMP ONLY)
McCormick, Barstow, Sheppard,
Wayte & Carruth LLP
P.O. Box 28912
5 River Park Place East
Fresno, CA  93720-1501
Telephone:     (559) 433-1300
Facsimile:     (559) 433-2300

Attorney for Plaintiffs
Emily Lowry and Kenna Ellis


## UNITED STATES DISTRICT COURT

## DISTRICT COURT OF UTAH


| | |
|---|---|
| EMILY LOWRY and KENNA ELLIS,<br><br>           Plaintiffs,<br><br>v.<br><br>MICHELLE ROMERO, ANNETTE B.<br>CAVANESS, CHRISTIAN J.<br>SEEGMILLER, CORBIN CHURCH,<br>MICHE BAG, LLC, and DOES 1-100,<br>inclusive,<br><br>           Defendant. | Case No.  2:11-cv-01075-DB<br><br>**MEMORANDUM IN OPPOSITION TO<br>THE COMPANY DEFENDANTS' (I.E. OF<br>MICHE BAG, LLC, CORBIN CHURCH,<br>AND CHRISTIAN J. SEEGMILLER) TO<br>DISMISS FOR FAILURE TO STATE A<br>CLAIM**<br><br>**District Judge:  Hon. Dee Benson**<br><br><u>**Oral Argument Requested**</u><br><br>**[Supporting documents: Exhibits 1-16<br>(Docket Nos. 57 – 73); Exhibits 17-20]** |

# TABLE OF CONTENTS

**Page**

I.   FACTS ........................................................................................................ VIII

A.   GENERAL STRUCTURE OF THE FIRST AMENDED COMPLAINT ("FAC")................................................................................ VIII

  1)   **JURISDICTION AND VENUE** .......................................... VIII

  2)   **DESCRIPTION OF DISPUTED INTELLECTUAL PROPERTY AND OTHER BINDER CONTENT** ............................. IX

  3)   **FORMATION, CONTENT, AND INITIAL PERFORMANCE OF THE PARTNERSHIP AGREEMENT** ....................................... XIII

  4)   **THE PARTNERSHIP PIVOTS TOWARD INTELLECTUAL PROPERTY ISSUES, INVESTMENT SOLICITATION, AND TEST MARKETING**................................................................XV

  5)   **ROMERO BREACHES HER FIDUCIARY DUTIES AND CONSPIRES WITH THE REMAINING DEFENDANTS, WHO KNOWINGLY COORDINATE WITH ROMERO TO DEFRAUD AND DISADVANTAGE THE PARTNERSHIP** .......XVIII

  6)   **PLEADINGS CONCERNING EQUITABLE AND MISCELLANEOUS ISSUES**............................................XXV

  7)   **CLAIMS AND PRAYERS** ............................................. XXVI

B.   THE HEARING AND PLAINTIFFS' EFFORTS TO CONFORM THE FIRST AMENDED COMPLAINT ("FAC") ............................................... XXVII

  1)   **PLAINTIFFS' EFFORTS TO IMPLEMENT INSTRUCTIONS FROM THE COURT'S HEARING AND ORDER** ............................................................... XXVII

  2)   **LOGISTICAL AND TECHNICAL CHALLENGES ENCOUNTERED BY PLAINTIFFS DURING PREPARATION AND FILING OF THE FAC** .......................... XXXI

C.   STIPULATION BETWEEN PLAINTIFFS AND DEFENDANTS .......... XXXIV

II.  LEGAL ARGUMENT ...................................................................................... 1

A.   STANDARD OF REVIEW ....................................................................... 1

B.   NEITHER THE COPYRIGHT ACT NOR THE PATENT ACT PREEMPTS ANY STATE CLAIM ................................................................ 1

1)   THE COPYRIGHT ACT DOES NOT PREEMPT ANY FAC STATE CLAIM.............................................................................................. 2

2)   THE PATENT ACT DOES NOT PREEMPT ANY STATE CLAIM................. 5

3)   TRADE DRESS CLAIMS AND ISSUES ARE NOT PREEMPTED BY THE COPYRIGHT  ACT OR THE PATENT ACT .......................................... 7

C.   CLAIM THIRTEEN FOR FRAUD IS ADEQUATELY PLED IN ALL RESPECTS ........................................................................................ 7

D.  CLAIM FIFTEEN FOR UNJUST ENRICHMENT IS ADEQUATELY PLED IN ALL RESPECTS ............................................................................... 14

E.  CLAIM SIXTEEN FOR TORTIOUS INTERFERENCE IS PROPERLY PLED IN ALL RESPECTS .................................................................................. 15

F.  RULE 8 AND RULE 41 ARGUMENTS WERE WAIVED AND LACK SUBSTANTIVE MERIT ..................................................................................... 20

III.  CONCLUSION ...................................................................................................... 25

## TABLE OF AUTHORITIES

**Page**

**CASES**

*American Dental Ass'n v. Delta Dental Plans Ass'n,*
  126 F.3d 977, 980 (7th Cir. 1997) ................................................................ 7

*Ashley Furniture Indus., Inc. v. SanGiacomo N.A. Ltd.,*
  187 F.3d 363, 376 (4th Cir. 1999) ................................................................ 7

*Asunto v. Shoup,*
  132 F.Supp.2d 445, 451-53 (E.D. La. 2000) ............................................ 4, 15

*Bailey v. Diamond Int. Corp.,*
  47 A.D.2d 363, 365, 367 (N.Y. Ct. App. 1975) ............................................ 12

*Bennett v. Huish,*
  155 P.3d 917, 931-32 (Utah Ct. App. 2007) ................................................ 12

*Bower v. Stein Eriksen Lodge Owners Ass'n,*
  201 F.Supp.2d 1134, 1143 (D. Utah) ............................................................ 20

*Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.,*
  373 F.3d 296, 305 (2d Cir. 2004) ...................................................... 2, 3, 10, 15

*Brigham Young University v. Pfizer, Inc.,*
  2012 WL 918744 *5, 5 n.31 (D. Utah) .......................................................... 5

*Buckles v. Brides Club, Inc.,*
  2010 WL 3190751 * 7 (D.Utah) .................................................................... 12

*Chao v. Rivendell Woods, Inc.,*
  415 F.3d 342, 346-348, 348 n.2 (4th Cir. 2005) .......................................... 22

*Davis v. Ruby Foods,*
  269 F3rd 818, 819-20 (7th Cir. 2001) .......................................................... 25

*Dorsey v. Money Mack Music, Inc.,*
  304 F.Supp.2d 858, 863-67 (E.D. La. 2003) ............................................ 4, 15

*Dunmore v. Dunmore,*
  2012 WL 2857666 *3 (E.D. Cal.) .................................................................. 21

*Farm Bureau Life Ins. Co. v. American Nat. Ins. Co.,*
  505 F.Supp.2d 1178, 1189-90 (D. Utah 2007) ............................................ 11

*Fenn v. Yale University,*
  283 F.Supp.2d 615, 628-40 (D. Conn. 2003) ............................................ 5, 15

*Finegan v. Myers,*
  2009 WL 960780 *2-3 (N.D. Ind.) ................................................................ 22

*Foley v. Luster*,
　　249 F.3d 1281, 1289 (11th Cir. 2001) ............................................. 4

*Gates Rubber Co. v. Bando Chem. Indus., Ltd.*,
　　9 F.3d 823, 847 (10th Cir. 1993) ................................. 2, 3, 10, 15

*Gateway Bottling, Inc. v. Dad's Rootbeer Co.*,
　　53 F.R.D. 585, 588 (W.D. Pa. 1971) ............................................. 24

*Harolds Stores, Inc. v. Dillard Dep't Stores*,
　　82 F.3d 1533, 1542-43 (10th Cir. 1996) ....................................... 2

*Hodgson v. Virginia Baptist Hosp., Inc.*,
　　482 F.2d 821, 823-24 (4th Cir. 1973) .......................................... 22

*Howard v. Sterchi*,
　　725 F.Supp. 1572, 1578-79 (N.D. Ga. 1989) ........................... 4, 15

*In re Asbestos Cases*,
　　1990 WL 36790 *1-2, 4 (N.D. Ill.) .............................................. 22

*In re O.P.M. Leasing Serv., Inc. v. Ganz*,
　　21 B.R. 986, 992-93 (1982) ........................................................ 25

*In re S & D Foods, Inc.*,
　　144 B.R. 121, 158-67 (Bkrtcy D. Colo. 1992)......................... 17, 19

*Integrative Nutrition, Inc. v. Academy of Healing Nutrition*,
　　476 F.Supp.2d 291, 298 (S.D.N.Y.2007) .................................. 4, 15

*Jones v. United Gas Improvement Corp.*,
　　383 F.Supp. 420, 423 n.2 (E.D. Pa. 1975) ................................. 22

*Jordan-Arapahoe, LLP v. Board of County Com'rs*,
　　633 F.3d 1022, 1025 (10th Cir. 2011) .......................................... 1

*Klepper v. First Am. Bank*,
　　916 F.2d 337, 340 (6th Cir. 1990) .............................................. 18

*Koch v. Koch*,
　　203 F.3d 1202, 1237 (10th Cir. 2000) ......................................... 22

*Kohler Co. v. Moen, Inc.*,
　　12 F.3d 632, 638 (7th Cir. 1993) .................................................. 7

*Leigh Furniture and Carpet Co. v. Isom*,
　　657 P.2d 293 (Utah 1982)............................................................ 16

*Magical Mile, Inc. v. Benowitz*,
　　510 F.Supp.2d 1085, 1089-90 (S.D. Fla. 2007)............................ 7

*Massachusetts Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.*,
　　552 F.3d 47, 67 (1st Cir. 2009) ............................................... 5, 15

*McKinzie v. Springfield City Water Co.*,
 14 F.R.D. 503, 803 (W.D. Mo. 1953) ........................................................................... 22

*Nagler v. Admiral Corp.*,
 248 F.2d 319, 322, 324, 328 (2d Cir. 1957) ................................................................. 23

*Oddo v. Ries*,
 743 F.2d 630, 633, 635 (9th Cir. 1984) ............................................................. 3, 10, 15

*Perington Wholesale, Inc. v. Burger King*,
 631 F.2d 1369, 1371-73 (10th Cir. 1979) ................................................................. 25

*Probert v. Clorox Co.*,
 258 F.R.D. 491, 495 (D. Utah 2009) ........................................................................... 22

*R.W. Beck, Inc. v. E3 Consulting, LLC*,
 577 F.3d 1133, 1147, 1149 (10th Cir. 2009) ............................................................... 3

*Rodime, PLC v. Seagate Tech, Inc.*,
 174 F.3d 1294, 1306 (Fed. Cir. 1999) .................................................................. 5, 15

*Russo v. Ballard Med. Products*,
 550 F.3d 1004, 1015-1016 (10th Cir. 2008) ........................................................ 6, 15

*Sadarangani v. Bank of America*,
 2009 WL 2175631 * 2 (S.D.Fla.) ............................................................................... 11

*Seng-Tiong Ho v. Taflove*,
 648 F.3d 489 (7th Cir. 2011) ...................................................................................... 4

*Shapiro, Berstein & Co. v. H.L. Green Co.*,
 316 F.2d 304, 307-09 (2d Cir. 1963) ......................................................................... 12

*Simaan, Inc. v. BP Products N. Am.*,
 395 F.Supp.2d 271, 278-80 (N.D.N.C. 2005) ................................................ xxxiv, 24, 25

*Simmons v. Abruzzo*, 49 F.3d 83, 85-88 (2d Cir. 1995) ................................................ 25

*Smith v. Jordan*,
 220 S.W.2d 481, 484 (Tx Ct. Civ. App. 1949) ............................................................ 12

*State v. Moore*,
 440 S.E.2d 797, 804, 814 (N.C. 1994) ........................................................................ 24

*Stromillo v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
 54 F.R.D. 396, 396-98 (E.D.N.Y. 1971) ........................................................... xxxiv, 25

*Sturdza v. United Arab Emirates*,
 281 F.3d 1287, 1305 (D.C. Cir. 2002) ................................................................. 3, 15

*Suntrust Mortg., Inc. v. Sharpe Mortg. Lending Serv. Of Ga., Inc.*,
 20011 WL 6178221 * 3 n.2, 4 (E.D. Va.) ................................................................... 24

*Tavory v. NTP, Inc.*,
    297 Fed.App'x 976, 983 (Fed. Cir. 2008)............................................................ 6

*Telecom Tech. Serv. Inc. v. Rolm Co.*,
    388 F.3d 820, 833 (11th Cir. 2004) ................................................................... 3

*Thompson v. Perkins*,
    911 S.W.2d 582, 586 (Ark. 1995) .................................................................... 24

*United States v. Morales-Aldahondo*,
    524 F.3d 115, 120 (1st Cir. 2008) .................................................................... 24

*United States v. Rivieccio*,
    846 F.Supp. 1079, 1085-86 (E.D.N.Y. 1994) .................................................... 11

*United States v. Schrock*,
    855 F.2d 327, 335 (6th Cir. 1988) .................................................................... 24

*Univ. of Colo. Found., Inc. v. Am. Cyanamid Co.*,
    196 F.3d 1366, 1371-72 (Fed. Cir. 1999) ................................................ 5, 6, 15

*Univ. of Colo. Found., Inc. v. Am. Cyanamid Co.*,
    342 F.3d 1298, 1304-06 (Fed. Cir. 2003), ...................................................... 6, 15

*Wachovia Bank v. Bank of Oklahoma*,
    2006 WL 2934 (W.D. Okla.) ........................................................................... 22

*Walling v. Black Diamond Coal Mining Co.*,
    59 F.Supp. 348, 349-50  (W.D. Ky. 1943 ......................................................... 24

*Wardley Better Homes and Gardens v. Cannon*,
    61 P.3d 1009, 1016-17 (Utah 2002).................................................................. 12

*Wood v. Houghton Mifflin Harcourt Pub. Co*,
    589 F.Supp.2d 1230, 1253-54 (D. Colo. 2008) ............................................. 4, 15

*Wynder v. McMahon*,
    360 F.3d 73, 74-75, 77-78 (2d Cir. 2004) ........................................................ 25

*Yazd v. Woodside Homes Corp.*,
    2006 UT 47, P35, 143 P.3d 283, 289 (Utah 2006) ..................................... 8, 10

## **STATUTES**

17 U.S.C. § 106 ..................................................................................................... 2

17 U.S.C. § 301 ..................................................................................................... 2

17 U.S.C. §102 ...................................................................................................... 2

17 U.S.C. §103 ...................................................................................................... 2

FRCP 8(a)(2)......................................................................................................... 24

**<u>TREATISES</u>**

37 Am. Jur.2d Fraud and Deceit § 306 ........................................................................ 11

37 Am. Jur.2d Fraud and Deceit § 311 ........................................................................ 12

37 Am. Jur.2d Fraud and Deceit § 316 ........................................................................ 13

Plaintiffs Emily Lowry and Kenna Ellis, by and through their undersigned counsel, submit the following Memorandum in Opposition to the Company Defendants' (i.e. Defendants Miche Bag, LLC, Corbin Church, and Christian J. Seegmiller) Motion to Dismiss for Failure to State a Claim.[1] ("M. Memo").[2]  Plaintiffs respectfully assert that all of the claims in the First Amended Complaint ("FAC") are properly plead and none should be dismissed.

## I.    FACTS

### A.    General Structure Of The First Amended Complaint ("FAC")

Defendants challenge the sufficiency of the FAC, both as to form and as to the allegations therein.  Accordingly, below is an abbreviated[3] summary of the FAC.

#### 1)    Jurisdiction And Venue

Plaintiffs' FAC is structured so that it first sets forth the basis for proper venue and

---

[1]  All "Docket No." cites herein for all documents references refer to the page number assigned by the blue ECF stamp at the top of each electronically filed page.

[2]  Defendants Corbin Church, Miche Bag, LLC, and Chris Seegmiller (collectively, the "Miche Defendants" who wrote the "M. Memo." at Docket No. 98) are openly coordinating their filings with Defendants Michelle Romero and Annette Cavaness (collectively, the "Romero Defendants" who wrote the "R. Memo." at Docket No. 96 and a joinder ("R. Joinder" at Docket No. 99).  *See* Docket Nos. 98, at 2, 99, at 1.  Accordingly, Plaintiff incorporates the content of both Plaintiff Oppositions to oppose, inter alia, each and all of Docket Nos. 96, 98, and 99, as submitted by all five named defendants.  ***This "Part I. Facts" summary is in both Plaintiff Oppositions in identical form.***

[3]  The FAC provides at least 223 different time references, including dates, date ranges, and identification of required actions never performed on any date.  *See e.g.* FAC ¶¶ 4, 8-10, 12-13, 15-16, 21-24, 26-28, 30-31, 33-34, 37, 39-41, 51-58, 61-64, 67-70, 72, 100, 106, 110, 112, 114, 120-21, 127, 129-30, 132, 134-35, 139, 146-49, 151, 153-54, 156, 159, 161, 163-64, 167; Prayers 17-18, 20, 24; Appendix A (19 dates related to 9 patents obtained with improper listings); and Appendix B (123 different dates related to 119 works obtained with improper listings and/or sold with lack of proper notification and royalties to Plaintiffs).  The FAC also enunciates the specific Defendant(s) associated with each of the FAC's 16 claims, each specific prayer, each of the incorrect listings for 9 patents and 119 works comprising the known Collection, and each of the various narrative events, so the FAC as a whole contains 308 different instances where the specific Defendant identity is mentioned.  *See e.g.* FAC ¶¶ 4, 8-13, 15-16, 18-37, 39, 40, 41-50, 52-65, 67-73, 75, 76-78, 82, 85-86, 89, 94, 96, 100-04, 107, 109-111, 113-114, 116-21, 123-130, 132-36, 138-40, 142-54, 156-57, 159-67; Prayers 4, 6-26; Appendix A (current listed inventors and proper listed inventors and owners for each of 9 Patents); Appendix B (current copyright claimants, listed authors, proper authors, and proper owners for 119 works); and every FAC claim heading (specifying both the Plaintiff(s) and the Defendant(s) on each claim.   The FAC also identifies locations in at least 18 different paragraphs.  *See e.g.* FAC ¶¶ 2, 9-10, 16, 22-23, 25, 30, 32, 36-37, 52-53, 55, 60, 67, 103, 164.  Accordingly, the summary herein does not attempt to reiterate all of the detail in the FAC itself.

jurisdiction.  FAC ¶¶ 1-2.

> ### 2)  Description Of Disputed Intellectual Property And Other Binder Content

The next section of the FAC describes and defines a disputed collection of interrelated designs and plans for a unique, integrated, modified tote-style purse product system.  *E.g.* FAC ¶ 3; *see also e.g.* FAC ¶¶ 4-17, Appendices A-B.  This includes description and identification of each and every disputed Base Bag, Shell, Strap, and Tassel,[4] as all such are described in, for example, FAC ¶¶ 3-17, and in the official registration descriptions for each of Patents and Copyrights, and as Trade Dress as defined in FAC ¶ 14, and in the listings and descriptions of Appendices A (9 patents) and B (119 works subject to copyright and/or trade dress as specified), and in Plaintiffs' Binders which contained the Drawings (everything in this sentence are part of what is collectively denoted in the FAC and for purposes of this response as the "Collection").

The FAC describes what the Plaintiffs[5] and various Defendants did (and did not) create, author, and invent with respect to the Collection.  *E.g.* FAC  ¶¶ 3-17, 33, Appendices A-B.  This includes, inter alia and without limitation, a description of the disputed Trade Dress, *e.g.* FAC ¶ 14; a description[6] of the Base Bag and Shell components Plaintiffs designed, *e.g.* FAC ¶¶ 3, 5-9,

---

[4]  The interchangeable decorative exterior cover of the purse is currently known as the "Shell" and can be switched out in favor of other Shells with different decorative exteriors, all without changing the interior structural component of purse which is the  primary container component of the purse for storing personal belongings ("Base Bag").  The Base Bag design also has four loop attachments that allow the two straps for the purse ("Straps" as in Appendix B) to be attached and removed at will through use of a metallic gate ring at each end of the Straps that click open and shut, so as to switch out straps of different looks and lengths.  Tassels can hang from these other components in various ways.  *See generally e.g.* FAC  ¶ 3.

[5]  Ellis is and was a professional interior designer, artist, and seamstress with years of experience, developed expertise, and awards for her work.  *E.g.* FAC ¶ 18.  Lowry is and was a professional artist specializing in an extensive assortment of tangible object designs, including jewelry, clothing, intricate cakes, drawings, and sketches.  *E.g.* FAC ¶ 19.  Miche Bag and Romero have publicly admitted that Romero has a "lack of sewing skills" and at the relevant time Romero also had no talent or experience as an artist, model-maker, industrial product designer, or the like.  FAC ¶ 20; *see also* Docket No. 31, at 3 (Ballo Decl. ¶¶ 7-8).

[6]  In addition to verbal descriptions and references, Plaintiffs have photographs and drawings of those specific Defendant Base Bags, Shells, Straps, and other Collection components that are substantively identical to what Plaintiffs created and to what Plaintiffs assert a right to manufacture and sell independently of Defendants (except for the "Miche" label per se, which Plaintiffs would not use on their own line of products).  The vast majority of these photographs and drawings are already on file.  *See e.g.* Ballo 3d Decl. ¶¶ 8-10, Exs. FF - HH; Wireman 2d

33, Appendices A-B; a description of some Prototypes that Plaintiffs co-created, including, inter alia and without limitation, Prototype A as pictured in *How I Made My Millions*, March 18, 2011, at http://video.cnbc.com/gallery/?video=3000011389 (hereinafter the "Video"), *e.g.* FAC ¶ 10; a list of nine Patents which are associated with official descriptions and drawings describing aspects[7] of the Collection invented by Plaintiffs, *e.g.* FAC ¶¶ 11-12, Appendix A; a list of fifty Copyrights which are associated with official copyright descriptions,[8] *e.g.* FAC ¶ 13, Appendix B, Table Row No. 1-50; a list of fifty-eight additional Shell designs of Plaintiffs that appear in two of Miche Bag's old product catalogs and/or on Miche Bag's Website, but have no associated copyright registration currently known to Plaintiffs, *e.g.,* FAC ¶¶ 13-14, Appendix B, Table Row No. 51-108; and eleven other designs (collectively, "Straps") created by Plaintiffs that appear in two of Miche Bag's old product catalogs and/or on Miche Bag's Website, but have no associated copyright registration currently known to Plaintiffs, and are part of Trade Dress, *e.g.* FAC ¶¶ 13-14, Appendix B, Table Row Nos. 109-119.

The FAC sets forth the current inventor and owner listings for each of nine different Patents, along with what the correct inventor and owner listings should say and the dates on

---

Decl. ¶¶ 19-21, Exs. FF - HH; Lowry 3d Decl. ¶¶ 6-11, Exs. T-Z, AA – II, PP;  Witte 5th Decl. ¶¶ 8 Exs. T-Z, AA – II, PP.  Plaintiffs do not believe it is necessary to attach these materials to the FAC, but have notified the Defendants and the Court that Plaintiffs are ready and willing to do so if the Court finds such a step necessary to cure any perceived deficiency with the existing FAC.  Lowry 3d Decl. ¶ 12, Ex. OO; Witte 5th Decl. ¶¶ 29-30, Ex. OO.

[7]  As set forth in the FAC, the official descriptions in the FAC's Patents and Copyrights set forth a *subset* of features encompassed within a more expansive set of features actually invented and authored by Plaintiffs and defined as the Collection.  The Patents collectively describe some but not all of the features of the Base Bag and Shell that Plaintiffs created and invented; the known Copyrights do not include all of the graphic designs and innovations that Plaintiffs authored and Defendants have actually used in commerce without fair royalty; and there are various aspects and devices within the Collection Plaintiffs created that are apparently not covered by either the FAC's listed Patents or Copyrights, but as relevant in each case appear to be either within the definition of Trade Dress or other categorization.  See Lowry 3d Decl. ¶ 13.

[8]  Typically Defendants filed at least one Copyright for each Shell decorative exterior (including, for example, a Copyright for each identical pattern in a different color such as green or purple, or as adjusted to match each different sized Shell), and typically each Copyright filing includes a photograph (but occasionally a drawing) of each relevant Shell exterior.  Usually the title of the work registered for copyright has the same name (typically including a female name, e.g. the "Green Ellie") as the official product name used in Miche Bag's Website or hardcopy catalogs. Ballo 3d Decl. ¶ 11; Wireman 2d Decl. ¶¶ 23.

which the fraudulent registrations were obtained.  *E.g.* FAC ¶ 12, Appendix A.  The FAC also sets forth the current known copyright claimant and author listed for each work subject to copyright, along with an indication about what the specified author and ownership listings should be for each work, the known dates on which the fraudulent registrations were obtained, and whether the work is derivative.[9]  *E.g.* FAC ¶ 13, Appendix B.  With respect to Trade Dress, the FAC describes the features and devices giving rise to Trade Dress and identifies who created the same.  *E.g.* FAC ¶ 14, Appendix B Table Row 109-19; *see also e.g.* FAC ¶¶ 9-11, 15-17, 33-34.

The FAC also sets forth information about the Plaintiffs' creative acts and events giving rise to the Collection.  Without limitation and except where specifically excluded by the FAC, Plaintiffs designed every component, feature, and aspect of the structural and aesthetic Base Bag design, the Straps designs, the structural Shell design, the aesthetic textural and pattern features for each Shell exterior, and the Collection as a whole, as described and identified in such places as paragraphs 3-10 of the complaint, and Appendices A and B.  *E.g.* FAC ¶¶ 11-13, 15-17, 33. In a nutshell, Plaintiff Lowry created a collection of drawings ("Drawings") depicting every aspect and component of the Collection, including without limitation the Base Bag components, Shell structural component, Straps, and Shell decorative cover designs.  *E.g.* FAC ¶¶ 4, 15-17, 19, 30.  Lowry would base her drawings upon her own ideas, blended with memorialization of ideas from Ellis and occasionally from Romero.  *E.g.* FAC ¶¶ 15-16, 30, 110.  Lowry would then show her sketches to Ellis and Romero, obtain their critiques, and then modify her drawings based upon their feedback, somewhat like a law enforcement artist might do when incrementally modifying a composite sketch of an unknown criminal suspect based upon witness descriptions. *E.g.* FAC ¶¶ 16, 30.  The creation and modification of the Drawings was accomplished during the Creative Period (i.e. on or about July 29, 2004, until on or about January 31, 2005) through a

---

[9]  During the hearing held on April 5, 2012 (the "Hearing" cited as "Tr."), Plaintiffs' counsel understood the Court to say, among other things, that Plaintiffs should specifically identify each disputed patent and copyright currently known, then articulate what author/inventor/ownership listings currently exist and what the listings should have said in order to be correct.  *E.g.* Tr. 68:10-19.  In light of this and other developments after the Hearing, Plaintiffs set forth the file listings information in two tables accompanied with legend and disclaimer information for interpreting the same (Appendices A and B) placed at the end of the First Amended Complaint.

combination of telephone calls and personal face-to-face meetings that occurred mostly in Lowry's home, in Ellis' home, and while Lowry and Romero carpooled to and from their common workplace.[10]  A large collection of drawings (i.e. "Drawings") were created, modified, and accumulated in this way, and then entrusted by Plaintiffs to Romero.  *E.g.* FAC  ¶¶ 4, 15-16. Romero[11] would then store the Drawings in a Binder.[12]

In order to augment, perfect, test, explain, and visualize potential design features of the Collection, it was necessary for Plaintiffs and Romero to create, utilize, and modify various physical Prototypes.  *E.g.* FAC ¶¶ 10, 110.  Some Prototypes were elaborate and approximated the materials and appearance of an entire finished purse; other Prototypes were ephemeral approximations of isolated Base Bag or Shell features made from cloth, paper, clips, etc.  *E.g.* FAC ¶ 10.  One of the Prototypes was a purse ("Prototype A") that is shown on a table next to Romero in *How I Made My Millions*, March 18, 2011, at http://video.cnbc.com/gallery/?video=3000011389 (the "Video"), and was jointly designed and created in every innovated respect by Plaintiffs and Romero.  *E.g.* FAC ¶ 10.  Prototype A does not embody every feature of the final Collection designs, but the Drawings did capture all of the innovated features of Prototype A and combined the same with other features.  *E.g.* FAC ¶ 10.

One of Romero's Binders primarily contained Drawings of Collection components and features, and illustrative notes and observations about aspects of the Drawings (e.g. notes delineating color combinations, potential variations on the same design, desirable materials and

---

[10]  Lowry and Romero worked at the same dentist office only up until on or around November 8, 2004, at which point Lowry took a position with another employer due to the increased compensation available.  Thus, the carpooling aspect of the creative consultations took place only from on or about July 29, 2004 (i.e. the "Spill Date") until on or about November 8, 2004. During this period, Romero lived in West Valley City, Utah, and Lowry lived in West Jordan, Utah. Lowry 3d Decl. ¶ 20.

[11]  Lowry and Romero formed a Partnership on the Spill Date, and since Romero had no sewing or artistic skills at the time, Romero served as the partner primarily responsible for record-keeping, finance, legal, and non-artistic duties.  FAC ¶¶ 4, 19-20, 23-25, 27-28, 30, 50, 110, 118, 120-21, 125, 127-30, 132, 134-35, 140, 144, 146-47, 149, 151-54, 156-57, 161, 163, 166-67. Drawings were stored primarily in one of the two Binders, but some were in a second Binder.

[12]  *E.g.* FAC  ¶¶ 4, 30, 110, 118, 120-21, 125, 127-30, 132, 134-35, 140, 144, 146-47, 149, 151-54, 156-57, 161, 163, 166-67, Prayers 7, 17-18, 20.

textures for a particular component, etc.).[13]   A second one of Romero's Binders primarily contained legal documents; product and market research; notes about purse component testing and selection, marketing, business, and product production plans and creative ideas (collectively "Plans"), as well as some Drawings and other miscellaneous content, all created and accumulated by Plaintiffs during the Creative Period and entrusted to Romero.[14]

### 3)   Formation, Content, And Initial Performance Of The Partnership Agreement

The FAC further explains that Lowry and Romero first met in 2003.  They were friends and co-workers who, among other things, would carpool to and from the dentist office where they both worked and go to lunch together during work breaks.  *E.g.* FAC ¶¶ 21-22.  On or about July 29, 2004 (the "Spill Date"), Lowry and Romero were together at lunch at a Salt Lake City Training Table restaurant when Romero experienced a spill on her handbag.  FAC ¶¶ 22.  This led to an instantaneous epiphany about the possibility of having decorative covers for a purse but keeping the same inner purse structure all the time.  FAC ¶¶ 23.  On this same Spill Date, while carpooling together after the Spill, Romero and Lowry telephoned Ellis; the three of them agreed at that very time that Romero and Lowry would form a Partnership effective on the Spill Date[15] and that Ellis would provide technical, creative, and other assistance to Partnership.  *E.g.* FAC ¶ 23.  Starting on the very evening of the Spill Date and continuing on for the following weekend, and indeed throughout a defined period of time denoted as the Creative Period, the three ladies repeatedly and explicitly continued to discuss and affirm the Partnership while taking a wide variety of actual steps to implement their Agreement and plans.[16]

The FAC sets forth the terms of the Partnership Agreement, describes how and when the

---

[13]   *E.g.* FAC ¶ 4, 9, 11, 13, 15-17, 19, 30, 110, 118, 120-21, 125, 127-30, 132, 134-35, 140, 144, 146-47, 149, 151-54, 156-57, 161, 163, 166-67, Prayers 7, 17-18, 20.

[14]   *E.g.* FAC ¶¶ 4, 9, 10, 15-17, 24-25, 30-31, 34, 110, 118, 120-21, 125, 127-30, 132, 134-35, 140, 144, 146-47, 149, 151-54, 156-57, 161, 163, 166-67, Prayers 7, 17-18, 20.

[15]   The FAC alleges the Partnership incepted on the Spill Date and has remained in force ever since without any dissolution.  *E.g.* FAC 12, 24, 27, 32, 41-43, 46, 48-49, 63, 72, 106.

[16]   *E.g.* FAC ¶¶ 4, 10, 15-17, 23-28, 30-37, 45-46, 50.

Agreement was reached, describes the form of the Agreement,[17] articulates Ellis' conditional pending gift of intellectual property to the Partnership, and provides examples of how the Partnership (tentatively called "ME Bag") was actually implemented through a pattern of conduct, reliance, investment, etc.[18]   Basically, Plaintiffs and Romero agreed that the three of them would design the Collection and develop the business plan together, with Plaintiffs contributing the lion's share of the artistic and practical design elements for the Collection and Romero primarily tending to record-keeping, legal, entrepreneurial, and financial planning tasks. However, Plaintiffs and Romero all participated to some significant degree in all aspects of the general enterprise.[19]   *E.g.* FAC ¶¶ 30-37.   Plaintiffs and Romero further agreed that Lowry and Romero would be partners of a business enterprise ("Partnership") to commercially develop and sell the Collection; Ellis would make a gift of Ellis' contributions of intellectual property and other inputs to the Partnership, based upon an understanding that the Partnership would utilize the Purse and Lowry would have a half interest in the Partnership and the Collection.[20]   *E.g.* FAC

---

[17]   The Partnership Agreement was explicit and verbal, starting on the Spill Date.   It was continually reaffirmed through numerous explicit verbal ratifications of the arrangements throughout the Creative Period, along with a course of performance and reliance by Plaintiffs and Romero according to the verbal terms that extended without limitation throughout the Creative Period.   In addition to a mutual confidentiality pact with Romero, Plaintiffs also collected written confidentiality agreements from family members and third parties, which were entrusted to Romero for safekeeping in the Binders.   *E.g.* FAC ¶¶ 23-24.

[18]   *E.g.* FAC ¶¶ 23-28; *see also e.g.* FAC ¶¶ 4, 10, 15-17, 23, 30-32, 43-46, 132, 134, 139.

[19]   Partnership activities were originally predominantly (though not exclusively) activities focused upon research, artistic conception, experimentation, and creative design related to the basic purse Collection components.   *E.g.* FAC ¶¶ 4, 10, 15-17, 23, 30.   As the Collection design effort progressed toward completion, Plaintiffs and Defendant Romero gradually began shifting their focus more heavily toward marketing, financial, investment, legal, and distribution issues that had to be surmounted to accomplish mass production of the Collection.   *E.g.* FAC ¶¶ 31, 34-37, 46.   They had to find a way to deploy the Collection into the marketplace with adequate legal arrangements for the Collection and Partnership, and secure capital to move forward on a variety of fronts.   *E.g.* FAC ¶¶ 30-31, 34-42, 50.

[20]   At the time of the spill, Lowry and Romero were young ladies who were coming of age with a desire to stand on their own feet and run their own business.   Ellis honored an arrangement that was explicitly designed so that Ellis could upon request provide vital contributions to the Partnership in the nature of materials, money, labor, creative expertise, consultative industry expertise, and professional networking connections, but Ellis could simultaneously avoid being a backseat driver with respect to daily Partnership operations as managed by Lowry and Romero.   *E.g.* FAC ¶¶ 23-25, 28. As part of an explicit understanding, Ellis did not discuss confidential information about the Collection or Partnership with anyone except as requested by Lowry and

¶¶ 23-28.  Until such time as financial sponsors could be obtained and legal agreements formalized with them, it was agreed Lowry and Romero would operate the Partnership on a debt-free, pay-as-you go, voluntary contribution basis.  *E.g.* FAC ¶ 25.  In other words, Lowry, Ellis, and Romero would contribute their money, materials, talents, and labor toward the Partnership on a voluntary basis in order to fully fund in advance any Partnership needs or initiatives that might arise, with no expectation of anything in return except for the enhanced value of the Partnership ownership interests.  *E.g.* FAC ¶ 25.

Once Plaintiffs and Romero had, inter alia, roughed-out versions of the Base Bag design, Shell design, and marketing plan, as well as a tentative name for the Partnership,[21] Plaintiffs and Romero then arranged for Lowry and Romero to pitch their invention to Pietra Wall, a Utah professional artist in leather goods who had connections with purse-makers.  *E.g.* FAC ¶¶ 26, 34-35.  Lowry and Romero made a presentation to Wall explaining their Partnership and the Collection, which briefly stated and without limitation included Collection Drawings and Prototypes.  Wall was impressed and urged Lowry and Romero to get patent protection for the Collection.  *E.g.* FAC ¶ 35.

### 4)   The Partnership Pivots Toward Intellectual Property Issues, Investment Solicitation, And Test Marketing

The Partnership then contacted Todd E. Zenger, Esq. ("Zenger"), an attorney specializing in intellectual property at the law firm of Kirton & McConkie, PC.  *E.g.* FAC ¶ 36.  Among other things, Mr. Zenger explained the patent application process for joint inventors and ran a trademark search on or about October 14, 2004, for the proposed "ME" trademark (from the initials of "Michelle" and "Emily") tentatively to be used for the "ME Bag" Partnership and the

---

Romero; Ellis was not a partner; and Ellis relied upon Lowry and Romero to inform and involve Ellis as need might arise.  *E.g.* FAC ¶¶ 31, 50, 54, 57, 61, 68, 70-72.

[21]  Plaintiffs and Romero initially focused their design efforts on developing the structure, configuration, appearance, components, and attachment system for the Base Bag and Shell. Continued experimentation and resultant slight adjustments in this regard were made to the Drawings up through the end of the Creative Period.  However, from mid-October 2004 until the end of January 2005, the creative focus turned increasingly to designing a collection of different decorative exteriors for additional Shells choices, designing different Straps and Tassels, and envisioning options for expansion of additional derivative and complementary products.

Purse products.  *E.g.* FAC ¶¶ 36-39.  On or about November 8, 2004, Zenger posted some of the results to Lowry.  *E.g.* FAC ¶ 39.  The Partnership was informed that "ME Bag" needed to be changed to some other name to prevent potential confusion with other trademarks and avoid legal complications; multiple patents and copyrights might be needed to protect various features of the Purse; and the cost for even one patent for any one Purse feature might exceed $10,000. *E.g.* FAC ¶¶ 37-39.  The Partnership needed additional funds to move forward and it also needed a name other than  "ME" or "ME Bag."

Friction occasionally arose between Lowry and Romero during the Creative Period. Strains eventually began to develop within the Partnership because of Romero's desire to alter the status quo Agreement in a number of important ways.[22]   Zenger's feedback enhanced Romero's desire to seek outside investors and quickly raise capital in order to accelerate the patent process and launch of the Collection. *E.g.* FAC ¶ 40.

Lowry and Romero engaged in a series of discussions and communications about the topic that extended both before and after February 2005.[23]  On or about the last week of February

---

[22]  Another source of disagreement was that Lowry, Ellis, and the Partnership originally contemplated creating an upscale version of the product line made with more expensive components such as leather, fiberboard, pellon, and stitching for purse names, and then potentially expanding to a less expensive product utilizing precisely the same Collection designs but incorporating less expensive materials such as layered cardboard, cotton liner fabric, and cotton broadcloth.  *See e.g.* FAC ¶¶ 5-6, 42.  Romero eventually favored starting with an inexpensive version of the product line first and then progressing to the upscale offerings.

[23]  Defendants incorrectly assert that "After this alleged falling-out [in February 2005], there was apparently no alleged attempt by either Lowry or Ellis to communicate with any of the Defendants until more than *six years later* after 'March of 2011[.]'"  Docket No. 96, at 3-4 (emphasis original).  In reality, there was no six year period without attempts to communicate, nor is one alleged anywhere in the FAC.  Defendants' attempt to mischaracterize the FAC and underlying factual circumstances are not well taken.

Plaintiffs' FAC—which was reluctantly cut down to "bare bones" form per the Court's direction at the last Hearing, at Defendants' behest—pleads that the February 2005 discussion was "one of a series of discussions about the topic," but does not allege that the February 2005 discussion constituted the last, final, or only discussion or communication between Romero and Lowry. *E.g.* FAC ¶¶ 41, 46.  Instead, the FAC sets forth that "Romero *eventually* refused to *speak* to Lowry," FAC ¶ 49 (emphasis added), which is not the same as alleging that Romero refused to speak in February 2005 or the same as alleging that episodes of interpersonal non-verbal communication did not occur even after Romero eventually started to refuse to offer verbal utterances.  Plaintiffs explicitly deny that Plaintiffs have alleged a gap in communication efforts between February 2005 and March of 2011, as posited by Defendants in Docket No. 96, at 3-4.

Defendants' factual summary also omits FAC allegations that Lowry engaged in "general

2005, during one of a series of discussions about the topic, Romero became especially emotional and requested that Lowry leave the Partnership by signing a document that so declared and that would relinquish Lowry's further participation in commercial Collection development. *E.g.* FAC ¶ 41.  Lowry indicated that the Collection was developed jointly with the involvement of Lowry and Ellis, and Lowry declined to sign away Lowry's rights to the Collection or Partnership. *E.g.* FAC ¶ 42.  However, Lowry was open to progressing forward with the current Partnership as agreed, or to selling Lowry's rights for an acceptable price to any prospective investor Romero might be able to procure, or to making other appropriate arrangements, subject to the legal paperwork that would need to be completed to consummate any such transaction. *E.g.* FAC ¶¶ 45, 48, 50.  Romero thus began searching for potential investors to put together a proposal to buy out the Partnership, an effort which required, inter alia, pitches to potential investors and test-

---

observation of Romero" but Lowry's various efforts suggested (apparently correctly) that Romero was "unsuccessfully but legitimately searching for investors" and "had nothing of any note to report to the Partnership."  FAC ¶ 49.  Additionally, the FAC says Plaintiffs' current information is that Romero and Cavaness did not engage in objectionable conduct until 2007, after a slim probability of securing investment had already further diminished and Romero had induced a false perception of intractable stasis. *E.g.* FAC ¶¶ 23, 44-45, 50, 52-54.

Consistent with the Court's directive for a "bare bones" complaint without inclusion of various additional details that could be explored during discovery, Plaintiffs reluctantly omitted information about, inter alia, Lowry herself and about why monitoring of Romero became more difficult.  But discovery will reveal, for example, that Lowry took another job on or around November 8, 2004, so that Lowry and Romero were no longer co-workers. *Cf.* FAC ¶ 16; Lowry 3d Decl. ¶ 20.  Also, after the February 2005 discussion mentioned in the FAC, Lowry eventually moved her residence to a different municipality located in Utah County.  Additionally, Lowry has had a perpetual susceptibility to tumors from 2002 until the present time, which was and is known to Romero; the condition manifests itself over time with sudden and unpredictable intensity, requiring surgeries and diverting Lowry's focus at various critical times. *See* FAC ¶ 72.

Similarly, as part of an explicit Agreement, Ellis was making a bequest, not actively managing the Partnership's long-term operations. *E.g.* FAC ¶¶ 23-25.  Ellis had agreed not to try to run the Partnership as a backseat driver and not to discuss confidential information about the Collection or Partnership with anyone except as requested by Lowry and Romero. *E.g.* FAC ¶¶ 24, 31, 132.  At all relevant times Ellis has lived in northern Utah, an hour's drive away from the 2004 Romero and Lowry residences.  In early May 2005, after the Collection was fully developed, Ellis' husband became horrifically ill from a sudden, large, life-threatening tumor, and had to have his face surgically removed and then gradually reconstructed, so that Ellis turned her focus to providing him with intensive care and managing her family household's ongoing crisis. *See* FAC ¶ 72.  Accordingly, Ellis relied upon Lowry and Romero to inform and involve Ellis as needed; Ellis' eventual understanding was that the Partnership progress had indefinitely stalled for lack of ability to raise funds, and Ellis did not learn about the improper actions of Romero and the other Defendants until Lowry informed Ellis in June 2011. *E.g.* FAC ¶¶ 50, 57, 71-72.

marketing of the Collection.  *E.g.* FAC ¶ 46.  Between on or about January 1, 2005, to on or about November 1, 2006, Lowry (with some limited input from Ellis) continued to develop, but not sell or commercially use, additional designs for Collection features as well as new non-Collection purses the Partnership might be able to eventually use once the Collection designs had been patented and commercially deployed.  *E.g.* FAC ¶¶ 47-48, Prayer 24.

> **5)    Romero Breaches Her Fiduciary Duties And Conspires With The Remaining Defendants, Who Knowingly Coordinate With Romero To Defraud And Disadvantage The Partnership**

The FAC then describes how in early 2007, Romero and Cavaness contacted Christian Seegmiller and Corbin Church, two multi-marketers with access to investment capital.  FAC ¶ 52.  From on or about January 1, 2007 to February 28, 2008 ("Inception"), Romero, Cavaness, Seegmiller, Church, and Miche Bag all knowingly reached, enabled, assisted, perpetuated, and consummated a common ongoing conspiratorial scheme to harm and defraud Plaintiffs.  FAC ¶¶ 52-53.  The planning for this occurred during the period from January 1, 2007, until July 1, 2007. *E.g.* FAC ¶ 52.

The Defendants knowingly conspired and coordinated to achieve a wrongful scheme with three overarching aspects.[24]

First, the Defendants would utilize the Binders to support operation of their own business (i.e. Miche Bag) from 2007 until present, by which they would enrich themselves but render no compensation of any kind to Plaintiffs.  *E.g.* FAC ¶¶ 52, 56.  This effort entailed, without limitation, utilizing Workman Nydegger law firm in Salt Lake City, Utah, to obtain falsified Patent and Copyright registrations as identified and dated in FAC ¶¶ 12-14, Appendices A-B, as

---

[24]    Some of Defendants' affirmative misconduct was consummated on a discrete date, such as when a falsified intellectual property registration was finally obtained without proper disclosure of the inventors/authors as any time during the application and evaluation process.  *See* FAC ¶¶ 11-14, Appendices A-B.  Other affirmative misconduct, such as ongoing exploitation of Binder marketing plans and other Plaintiff work product, was ongoing in the sense that it incepted in 2007 and has continued unabated until the present time.  Finally, the FAC also alleges ongoing improper omissions in violation of intellectual property law and/or fiduciary duty obligations, such as ongoing failure to report test marketing results or afford notice to Plaintiffs about the intellectual property filings.  The ongoing wrongful acts and omissions took place over a period of time and so the FAC designates time frames to describe their conspiratorial occurrence.

well as continuously utilizing the market research, business plans, and marketing plans in the Binders to commercially operate Miche Bag from July 1, 2007, until present. *E.g.* FAC ¶¶ 4, 53.

Thus, at the heart of the common scheme was "Defendants' use of the Plans and Collection designs in the Binders from 2007 onward" without notification to, consent from, or compensation for the Plaintiffs,[25] notwithstanding Plaintiffs' entitlement to the same based upon Plaintiffs' status as original authors, inventors, and creators of the Collection and parties to the Partnership Agreement.  FAC ¶ 53.  Starting at Inception and on a continuous basis afterwards, the Defendants utilized a Salt Lake City firm, Workman Nydegger, to apply for and obtain Copyrights and Patents "with falsified author, inventor, ownership, and assignment listings . . . as described in paragraphs 11-13 and Appendices A-B";  made uncompensated use of Plaintiffs' market research, market plans, business plans, creative ideas, and consultative expertise, as memorialized in the Binders and otherwise shared with Romero by Plaintiffs;  and cooperated with Romero to conceal and divert revenue streams generated by use of the Binder content rather than rendering a proper accounting to the Plaintiffs and Partnership.[26]  *E.g.* FAC ¶¶ 53-61; Docket Nos. 31, at 6 (¶ 6); 67, at 6 (¶ 21). "Among other things, Church became CEO of Miche Bag and directed its implementation of the scheme; Romero and Cavaness provided a falsified story for the origin of the Collection to third parties when needed; and Seegmiller arranged for surreptitious manufacture of the Collection in China" instead of Utah.  FAC ¶¶ 52.

---

[25]  Since Romero was a partner and held the materials on behalf of the Partnership without any apparent misconduct, neither Plaintiff had reason or occasion to demand that Romero return originals or copies of these materials.   Once Romero's violation of her fiduciary duties was discovered, Plaintiffs made demand for the Partnership records and property on various occasions after June 28, 2011. Romero has refused to disgorge the Partnership records or render any accounting; refused to confirm anything related to the current condition or whereabouts of the Partnership property that Plaintiffs entrusted to her care; and refused to confirm that the aforesaid evidence is being properly preserved for eventual production during formal discovery. *See e.g.* Docket Nos. 37, at 3 of 5; 32, at 50 of 70; 41-5, at 43 of 58.

[26]  Diversion of profits can occur only if a profit has accrued and reached the point of accounting reconciliation, which in turn can be precisely ascertained through review of the accounting records and internally applied accounting conventions.   The FAC explains that the date when profits would have accrued in a cognizable and reportable form would at the earliest have been no earlier than during the first fiscal quarter of 2008 (if accounting was performed immediately for a period ending on December 31, 2007, and a profit was realized), and could have been no later than December 31, 2009 (based upon Defendants' discussion about their revenues in the Video, profits must necessarily have been accrued and known by that time). *E.g.* FAC ¶ 54.

Second, from 2007 onward, the Defendants conspired in a wide variety of ways to conceal from Plaintiffs the Defendants' commercial activities, exploitation of the Binders, and diversion of the profits. This entailed, without limitation, tactics such as fabricating various false stories about Miche Bag's history and the origin and development of the purse Collection, so that Plaintiffs would receive no mention and no contact from potential business partners; threatening and monitoring Defendants' own distributors to keep quiet about the distributors' suspicions, as occurred in 2009-10 and thereafter with, for example, declarant Shelly Ballo; withholding legally-required notices about the intellectual property filings from the Plaintiffs on a continuous basis from 2007 onward; and various other acts, misrepresentations, and omissions used in concert by Defendants to accomplish their common scheme. *E.g.* FAC ¶¶ 50-56, 58, 60-61, 63-67, 70-74; Ballo 3d Decl. ¶¶ 16, 21-22, 29, Ex. JJ; Wireman 2d Decl. ¶¶ 4-5, 16, Ex. JJ. Defendants used low-profile tactics such as "home party" distribution, rather than use of retailers such as Target or Wal-Mart, and manufacture of Miche product in China rather than in the local Utah community of purse makers, to help achieve Defendants' objectives. *E.g.* FAC ¶ 53. Defendants also used straw entities, misrepresentation, and concealment in order to obscure the legal pedigree and structure of Miche Bag and related alter ego entities, thereby disguising operations, filings, and funds associated with the conspiracy. *E.g.* FAC ¶¶ 52, 60, 67-69; 41-45; Witte 5th Decl. ¶¶ 40-45, Exs. T-U, X.  As already extensively documented in the earlier protective order motion filings in this case, Church and Miche Bag spoliated evidence such as critical Website pages,[27] attempted to conceal the spoliation, and engaged in a variety of

---

[27]  For example, Miche Bag and others spoliated http://www.michebag.com/our-story, containing a story about how a "homemaker named Michelle" had spilled a drink on her purse, come up with the idea "to create a bag with changeable covers," created a prototype purse on her own, and then "shared" it with Church and Seegmiller.  The website page made no mention of Ellis, Lowry, or Cavaness, and instead represented that "Michelle" had completed all of the aforementioned steps alone notwithstanding "her lack of sewing skills."  The web page further represented that "Michelle" had subsequently approached Church and Seegmiller because "Corbin [Church] had experience running successful businesses and Chris [Seegmiller] had a background in importing and exporting," but provided no explanation about who would have had the artistic, sewing, model-making, and related talents actually needed to invent and design the purse. *E.g.* Docket Nos. 32, at 2, 11 (¶ 4); 33, at 2 (¶¶ 3-4); 33-2, at 2.

As discussed in more detail elsewhere, *see* section I.B.II, *infra*, Miche Bag also spoliated product

misrepresentations and obstructions to Plaintiffs' good-faith investigatory efforts,[28] doing so with active assistance and enablement from the other Defendants.[29]  *See* FAC ¶¶ 52, 60, 67-69.

Third, Romero and the other Defendants conspired and coordinated to improperly manipulate Plaintiffs and the Partnership through misuse of Romero's fiduciary relationship. The Defendants knew that the Partnership could be held in stasis for quite some time by Romero's exercise of a Partner veto within the Partnership; that Plaintiffs had would likely honor Plaintiffs' promises of confidentiality in connection with the Partnership, which would hamper Plaintiffs' ability to detect improper activities; and that Plaintiffs could be misled about the economic and legal status of the Collection if Romero and the other Defendants could successfully withhold information about the 2007 test marketing results, the 2008 offers from Target and Wal-Mart, and other material information that Romero had an affirmative fiduciary obligation to report to Plaintiffs.  *E.g.* FAC ¶¶ 37-46, 50-53, 60, 70-72, 118, 146, 163.

Thus, the FAC says that on behalf of the conspirators, Romero exploited her fiduciary relationship with Plaintiffs "in a manner calculated to keep Plaintiffs and the Partnership in a condition of reliance, confusion, and stasis, and prevent Plaintiffs from launching their own competing commercial utilization of the Binder contents and legally intervening to stop Defendants' unilateral filings[.]"[30]  Romero and the other Defendants cooperated with Romero to

---

listings and photographs on its Website, thereby temporarily depriving Plaintiffs of important evidence during Plaintiffs' efforts to investigate and (later) to draft a complaint.  *See also* Docket Nos. 40-1, at 4 (¶¶ 6-7, 10); 40-3, at 4 (¶ 10).

[28]  Plaintiffs made an effort to obtain Partnership records and property from Romero; conduct a meaningful investigation with all Defendants; and negotiate an amicable resolution.  *See e.g.* Docket No. 41-4, page 37 of 56 (containing email of July 1, 2011, to Mr. Chris Seegmiller, and also the Notification Letter of June 28, 2011, to Miche Bag's Legal Department, and Miche Bag, LLC); Docket No. 41-5, at 2 of 58 (Exhibit J to the Second Declaration of Daniel E. Witte, Tolling Agreement); No. 41-5, at 30-58 (Exhibit K to the Second Declaration of Daniel E. Witte, Letter Agreement of September 27, 2011, concerning the rules to govern negotiations).

[29]  *See e.g.* Docket Nos. 57, at 3-6 (Wireman Decl. ¶¶ 4-10); 58, at 3-6 (Ballo Decl. ¶¶ 5-13); 59, at 3-8 (Ballo 2d Decl. ¶¶ 6-13); 60, at 3-4 (Lowry Decl. ¶¶ 10-11); 61, at 3-5 (Lowry 2d Decl. ¶¶ 6-10; 62, at 3-6 (Witte Decl. ¶¶ 6-17); 63, at 6-11 (Witte 2d Decl. ¶¶ 6-11, 15); 65, at 3-9 (Witte 3d Decl. ¶¶ 5-16); 66, at 2, 5-20 (Witte 4th Decl. ¶ 3, Exhibit R); 67, at 5 (Corbin Decl.  ¶¶ 14, 22-25); 68, at 3 (Engerman Decl. ¶ 7); 69, at 4 (Gardner Decl. ¶ 10); 70, at 3 (Patton Decl. ¶ 5); 71, at 3-4, 6-11 (Reymann Decl. ¶¶ 4, 6, Ex. 1); 72, at 3-4 (Reymann Errata Decl. ¶ 6); 73, at 2-3.

[30]  *E.g.* FAC ¶ 53.  The FAC further sets forth that Romero exercised her practical veto as a partner to keep the Partnership in a position of legal and fiscal stasis until Romero's demands

conduct market testing of Collection products in July 2007 without disclosure of the activities or very promising results to the Plaintiffs.[31]  All of the co-conspirators thereby diverted and usurped business opportunities to which the Partnership was properly entitled, including potential 2008 deals with Wal-Mart and Target that were turned away without notification of the Partnership and Plaintiffs.  The Defendants all engaged in active fraudulent concealment, deception, and fabrication, utilized Romero's abuse of a fiduciary duty as part of the scheme, and thus succeeded in keeping Plaintiffs from discovering the conspiratorial scheme until 2011.  *E.g.* FAC ¶¶ 57, 70-74.

The FAC asserts that Defendants conducted the aforementioned three-part mosaic of improper, choreographed, conspiratorial actions with full knowledge and malicious intent.  FAC ¶ 165.  The FAC recites, inter alia, that conspirators "Cavaness, Seegmiller, Miche Bag, and Church knew and should have known that Romero did not and could not have developed the Collection designs on her own" and that along with Romero the other Defendants "all knowingly reached, enabled, assisted, perpetuated, and consummated a common ongoing scheme to harm and defraud Plaintiffs."[32]  *E.g.* FAC ¶¶ 52, 58, 147.  "This is so because, inter alia, Romero

---

were met regarding investment funding and altered governance arrangements (or buyout or partition) of the existing Partnership, as were ostensibly to be resolved on the basis of an actual prospective investment or buyout proposal to be secured by Romero through pitching and test marketing.  *E.g.* FAC ¶¶ 43-44, 46.  Romero kept the Partnership veto in place without ever lifting it or telling Plaintiffs that Romero intended to register the Collection intellectual property in Defendants' names.  *E.g.* FAC ¶¶ 43-44, 46, 50, 52-54, 57, 70-72.  In addition to using her partner position to impose an unnecessary legal impediment on the progress of the Partnership, and withholding from Plaintiffs any information about the other Defendants' investment and activities in relation to the Collection, Romero also concealed the test marketing results and commercial opportunities that would have made Plaintiffs timely aware of the economic viability of the Collection.  *E.g. id.*  In short, the FAC alleges Romero and the other Defendants conspired to exploit the Plaintiffs' Binder content themselves as quickly and surreptitiously as possible while simultaneously deceiving and disadvantaging the Plaintiffs and the Partnership for as long as possible.  *E.g. id*; *see also* FAC ¶¶ 53, 71-72, 163.  This approach would afford Defendants maximum lead time to secure falsified intellectual property registrations, conceal their actions, and obtain a competitive edge in the marketplace over the Partnership.

[31]  According to the Video, test marketing in 2007 yielded extremely promising results.

[32]   Plaintiffs acknowledge a factual dispute about the knowledge of Miche Bag, Church, and Seegmiller, which may find its way before a jury.  Tr. 8:11-15 ("In 2007 my client, in an arm's length transaction with Ms. Romero and Ms. Cavaness, Mr. Burton's clients, purchased I.P. rights from Ms. Romero and Ms. Cavaness. They are a bona fide purchaser. They had no knowledge of the plaintiffs' claims to ownership of any of the intellectual property."); Docket

obviously lacked the sewing, interior design, production, fashion, or artistic experience necessary to actually design or create such Drawings and Prototypes by herself; the Defendants admitted knowing about Romero's lack of sewing skills on their websites and in other literature distributed from 2007 until 2011; and Defendants have engaged in a variety of uncooperative and improper acts from June 28, 2011, to present that are utterly inconsistent with the actions of a responsible, bona-fide, arms-length bystander."   FAC ¶ 58.   The FAC alleges the other Defendants assisted Romero with sponsorship of carefully crafted misrepresentations about the Collection's origin; searched and monitored Miche Bag distributors to ensure that they did not record Romero's falsified story about the origin of the Collection and Miche; tamped down "conspiracy theories" shared amongst suspicious Miche Bag distributors; and engaged in threats and reprisals against distributors who continued to raise inconvenient questions about product origin, on various occasions and at such events as the 2009 Miche Sales Conference.  FAC ¶ 55 (citing eyewitnesses Shelly Ballo and Vicki Wireman at Docket Nos. 31, 40-1, 40-2); Ballo 3d Decl. ¶¶ 16, 21-22, 29, Ex. JJ; Wireman 2d Decl. ¶¶ 4-5, 16, Ex. JJ.

The FAC further explains that "[t]he pattern of falsified listings in the Copyright and Patent filings indicates that Miche Bag (with Church as CEO), Cavaness, and Seegmiller were all listed as inventors and/or authors of various designs and patterns as specified in Appendices A and B that were in the Binders; they necessarily knew they did not personally or directly create the designs and patterns set forth in their signed filings."  FAC ¶ 58.  In other words, the FAC is alleging this Court does *not* confront a situation where Romero simply (and falsely) filed her *own name* as the (obviously unlikely) sole author, inventor, and owner of each component of the Collection, only to then assign *ownership* of the fabricated registrations over to the other unsuspecting Defendants in an arms-length assignment.  Instead, the Defendants split up the Collection designs in the Binders obtained from Romero and then submitted numerous separate fraudulent filings which in many instances list *Christian Seegmiller*, *Annette Cavaness*, and

---

No. 98, at 2-3 ("until receiving Plaintiffs' pre-litigation demand letter in June 2011, the Company Defendants had no idea that Plaintiffs even existed").  To her credit, Cavaness has so far refrained from any similar representations to the Court that she was unaware of Plaintiffs.

*Miche Bag, LLC, employer for hire* as original *inventors* and *authors* of the very same Collection designs that the *Plaintiffs had earlier created and placed in the Binders*.[33] Thus, the FAC posits that, even if, arguendo, Defendants' purported belief in Romero's extremely unlikely story about sole self-creation of the Collection is insufficient evidence in and of itself with respect to demonstrating the other Defendants' conspiratorial knowledge and enablement so as to harm Plaintiffs, any hypothetical lingering doubt is removed by the pattern set forth in the FAC that shows Defendants represented *themselves* in falsified intellectual property filings to be *original authors and inventors* of works they necessarily had to know they did not personally create.

In addition, although Defendants' intellectual property filings represent that Christian Seegmiller was a co-inventor of at least nine critical Patents for the basic Base Bag and Shell design, that factual narrative is inconsistent with at least two other versions of the purse/Miche origins myth that Michelle Romero, Annette Cavaness, and Miche Bag's catalog perpetuated at various other times—namely, that Michelle Romero invented the purse all alone, or alternatively that Michelle Romero and Annette Cavaness (but not Christian Seegmiller) invented the purse.[34]

---

[33]   *E.g.* FAC ¶¶ 12-13; Appendix A (*Cavaness* and *Seegmiller* listed as original inventors of nine patents along with Romero); Appendix B, Table Row Nos. 3, 12-13, 15, 17-18, 22, 24, 26, 31, 42, 47, 48 (original author listings attributed to "*Miche Bag, LLC*" or "*Miche Bag, LLC, employer for hire*") or "*Miche Bag, LLC d.b.a. Miche Bag*" instead of listing Lowry, Ellis, or even Romero); Appendix B, Table Row Nos. 7, 19-20, 34, 36, 38-40, 44, 49-50 (original authorship attributed to *Cavaness* and Romero, rather than Romero only).  Defendants have not explained how "*Miche Bag, LLC d.b.a. Miche Bag*" listings are consistent with "arm's length[.]"

[34]   Church also wrote an article entitled *How I Made My Millions: 5 Proven Tips for Success,* http://www.cnbc.com/id/41990282, see Ballo 3d Decl. ¶ 28, Ex. KK; Wireman 2d Decl. ¶ 15, Exs. KK, in which Church and Miche Bag publicly admitted awareness that "[o]thers have tried to do what we do" with respect to developing "seamless, hidden magnetic attachment mechanisms that make changing Shells easy."  Church then accompanied this admission with a false assertion that these "others" have had "little success."  Church also mentions having a "'why didn't I think of that?' feeling," being aware that "a handbag with interchangeable outer covers . . . was a concept that could potentially revolutionize the women's accessories market" and "I wasn't going to let it get away," and understanding the need to "Get Your Own Hands Dirty, Then Delegate."

In truth, Ellis and Lowry successfully and exclusively imagined, developed, physically tested the magnetic attachment mechanism for the Base Bag and Shell while in physical presence of Romero and other witnesses; various other witnesses saw and heard about what Ellis and Lowry had developed.  Romero and Church (in concert with the other Defendants) then subsequently and surreptitiously collaborated to utilize this essential feature of the Collection without disclosure or accounting to the Plaintiffs by taking advantage of a distraction caused by the chronic health challenges from tumors suffered by Lowry and Ellis' husband and Mr. Ellis'

*E.g.* Ballo 3d Decl. ¶¶ 8, 13-14, 17-19, 29, Ex. JJ; Wireman 2d Decl. ¶¶ 6-7, 12, 15-16, Exs. JJ-KK.

### 6) Pleadings Concerning Equitable And Miscellaneous Issues

The FAC explains, inter alia, that even after receiving formal notification about the Plaintiffs' concerns on July 28, 2011, Defendants have persisted in their ongoing pattern of wrongful, fraudulent, tortious, unjust, conspiratorial conduct. *E.g.* FAC ¶¶ 60, 67, 70, 74, 77-78, 83, 102, 163, 167. Defendants have afforded no indication that they will cease and desist from their ongoing pattern of wrongful conduct, or refrain from continued retention of the ongoing benefits unjustly retained from Plaintiffs, or begin to render fair compensation to Plaintiffs. *Id.* Romero's wrongful acts are ongoing and she has refused to disgorge originals or copies of the Binders content to Plaintiffs notwithstanding ongoing requests initiated on or about June 28, 2011. FAC ¶ 68. All of the Defendants have refused to voluntarily provide various records and information that is necessary to investigation and resolution of the dispute, much of which is in Defendants' exclusive possession and control. FAC ¶ 69.

The Defendants have unjustly enriched themselves without compensation or consent from Plaintiffs, and continue to engage in wrongful acts against Plaintiffs' interests. FAC ¶ 69. Defendants have commingled and reinvested revenues properly owed to Plaintiffs, and Plaintiffs face harassment from Defendants if Plaintiffs independently develop the Collection without first resolving legal disagreements with Defendants about the Collection.[35] A remedy at law, although also necessary, cannot on its own afford full or adequate protection to Plaintiffs. FAC ¶

---

treatment at the Huntsman Cancer Institute, *see* FAC ¶ 72. Furthermore, Prototype A as pictured in the related CNBC Video could not have transferred knowledge about the magnets or magnet research to Church, because that aspect of the Collection design was found only in the Drawings within the Binders.

Plaintiffs believe that the existing FAC recites abundant facts demonstrating that the other Defendants besides Romero knew about Plaintiffs' work to develop the Collection designs, and so recitation of the above information from ¶ 57.e. of the original complaint was reluctantly cut only so that Plaintiffs could compress the length of the FAC per the Court's direction. Plaintiffs' continued preference is, respectfully, to recite this and other omitted facts in a lengthier FAC.

[35]  FAC ¶¶ 12-13, Appendices A-B (specifying precise designs Plaintiffs wish to use, see also FAC ¶¶ 3-17, 76-77; Ballo 3d Decl. ¶¶ 8-10, Exs. FF - HH; Wireman 2d Decl. ¶¶ 19-21, Exs. FF -HH; Lowry 3d Decl. ¶¶ 6-11, Exs. T-Z, AA – II, PP; Witte 5th Decl. ¶ 8 Exs. T-Z, AA – II, PP.

78.  As may be relevant, various legal and equitable rights, remedies, and damages are pled in the alternative.  FAC Prayer 1.

### 7)  Claims And Prayers

In order to comply with a length limitation imposed by the Court during the Hearing, the FAC asserts only sixteen claims[36] instead of eighteen as articulated in the original complaint. Twenty-six prayers are then listed.  Legal or equitable relief, as applicable, is requested on behalf of specified Plaintiff(s) against identified Defendant(s) in connection with specified claim(s). This litigation poses the need for both retroactive relief (i.e. harms inflicted by Defendants up until the filing of this present legal action) and prospective relief (i.e. ensuring that on a going-forward basis Plaintiffs will be able to own, utilize, commercially deploy, and otherwise fairly benefit from their Collection and other related purses they designed).  The prayers set forth that Plaintiffs seek to do all of the following (at minimum, and by way of selective summary instead

---

[36] FAC Claim One is for "Declaratory Judgment of Non-Infringement for Plaintiffs' Prospective Use of Collection," "By All Plaintiffs Against All Named Defendants And All Nominal Defendants[.]"  Claim Two is for the "Federal Right To Claim Authorship Of Copyrighted Work," "Asserted By Both Plaintiffs Against All Named Defendants And Nominal Defendants[.]"  Claim Three is for "Federal Infringement Of The Right Of A Copyright Owner—Right Of Copyright Author To Be  Properly Listed On A Copyright And Exercise Ownership Rights In Connection Therewith," "Asserted By Both Plaintiffs Against All Named Defendants And Nominal Defendants[.]"  Claim Four seeks "Federal Action For Copyright Accounting From Copyright Co-Owner(s)[,]" "Asserted By Both Plaintiffs Against All Named Defendants[.]"  Claim Five is for "Federal Infringement Of The Right Of A Patent Inventor— Right Of Patent Inventor To Be  Properly Listed On A Patent And Exercise Ownership Rights In Connection Therewith," "Asserted By Both Plaintiffs Against All Named Defendants."  Claim Six is for a "Federal Declaration Concerning Trade Dress[,]" "Asserted By Both Plaintiffs Against All Named Defendants[.]")  Claim Seven is for "Utah State Claim For A Partnership Dissolution[,]" "Asserted By Plaintiff Lowry Against Defendant Romero[.]"  Claim Eight is a "Utah State Claim For A Partnership Accounting[,] "Asserted By Both Plaintiffs Against Defendant Romero[.]"  Claim Nine is a "Utah State Claim For A Breach Of Fiduciary Duty[,]" "Asserted By Both Plaintiffs Against Defendant Romero[.]"  Claim Ten is a "Utah State Claim For Negligence," "Asserted By Both Plaintiffs Against Defendant Romero."  Claim Eleven is a "Utah State Claim For Breach Of Contract[,]" "Asserted By Both Plaintiffs Against Defendant Romero[.]"  Claim Twelve is a "Utah State Claim For Breach Of The Covenant Of Good Faith And Fair Dealing[,]" "Asserted By Both Plaintiffs Against Defendant Romero[.]"  Claim Thirteen is a "Utah State Claim For Fraud[,]" "Asserted By Both Plaintiffs Against All Named Defendants."  Claim Fourteen is a "Utah State Claim For Conversion[,]" "Asserted By Both Plaintiffs Against Defendant Romero."  Claim Fifteen is a "Utah State Claim For Unjust Enrichment And Equitable Restitution[,]" "Asserted By Both Plaintiffs Against All Named Defendants[.]"  Claim Sixteen is a "Utah State Claim for Interference with Present and Prospective Economic Relations[,]" "Asserted By Both Plaintiffs Against All Named Defendants[.]"

of limitation): (a) quiet intellectual property title to the Collection through reformation or invalidation of any and all fraudulent intellectual property filings, (b) sell the Collection product in the future in exactly the same form and design Defendants are currently selling it (but with a name other than "Miche" affixed thereto), without interference from anyone, including any of the Defendants (and/or transfer the rights to do so to a third party or to Defendants in exchange for adequate consideration or future royalties), (c) receive an accounting and fair share of improperly concealed revenues already accrued by Defendants through undisclosed exploitation of Plaintiffs' Collection, including all Binder contents, as appropriate in light of facts found and other remedies granted, and (d) recover for Defendants' tortious interference with economic relations and misappropriation of concealed business opportunities in relation to the Collection.

### B. The Hearing And Plaintiffs' Efforts To Conform The First Amended Complaint ("FAC")

Defendants have accused Plaintiffs of acting "contrary to this Court's *express instructions*" in a way that requires the Court to consider steps needed to "coerce compliance." Docket No. 98, at 3. Plaintiffs disagree. Unfortunately, a recitation of certain additional facts is necessary for meaningful consideration of the matter, and this is provided below.

#### 1) Plaintiffs' Efforts To Implement Instructions From The Court's Hearing And Order

During the Hearing held on April 5, 2012, Defendants complained to the Court about "three major defects" they perceived in the original complaint. Tr. 7:10-25. First, they said that the claims needed to "say who the claims are alleged against and what the basis is for each defendant."[37] Tr. 7:12-13. Second, they asserted that the original complaint "lumps all of the intellectual property together, all the 18 copyrights and all the [9] patents that have been issued,"

---

[37] For Plaintiffs' effort to respond to this purported concern with 308 different instances where the specific Defendant identity is mentioned, *see e.g.* FAC ¶¶ 4, 8-13, 15-16, 18-37, 39, 40, 41-50, 52-65, 67-73, 75, 76-78, 82, 85-86, 89, 94, 96, 100-04, 107, 109-111, 113-114, 116-21, 123-130, 132-36, 138-40, 142-54, 156-57, 159-67; Prayers 4, 6-26; Appendix A (current listed inventors and proper listed inventors and owners for each of 9 Patents); Appendix B (current copyright claimants, listed authors, proper authors, and proper owners for 119 works); and every FAC claim heading (specifying both the Plaintiff(s) and the Defendant(s) on each claim).

and demanded that the complaint "specifically identify,. . . describe or explain the various pieces of intellectual property to which the plaintiffs claim a right[.]" Tr. 7:17-18.  "There are 27 of them. . . . [Plaintiffs] are uniquely situated to go in and look at every single one of them and say we created this design."[38]  Tr. 46:3-9.  Third, Defendants said the complaint did not afford them dates about the timeline,[39] "[w]hen . . . the plaintiffs claim that they invented or came up with the idea of the purse" and "reduce [the idea] to practice,"[40] and when the Partnership began[41] and ended.  Tr. 11:9-15.  Defendants' filings and oral arguments (*see* Docket Nos. 50; 52; 76-77) did not dispute Plaintiffs' observations—as made in Plaintiffs' filings and Plaintiffs' oral argument[42]—that a pleading can set forth a period of time under certain circumstances that apply in this case.[43]

The Court granted Plaintiff's Motion to Amend on or before May 21, 2012, but indicated some modifications needed to be included in the FAC.  Docket No. 86.  During the Hearing, Plaintiffs' counsel understood the Court to say that Plaintiffs' FAC should specifically identify each    disputed    patent    and    copyright    currently    known,    then    articulate    what

---

[38]  For Plaintiffs' effort to respond to this purported concern, *see e.g.* FAC ¶¶ 12-15, Appendices A-B,  FAC ¶¶ 12-13, Appendices A-B (specifying precise designs Plaintiffs wish to use, see also FAC ¶¶ 3-17, 76-77; Ballo 3d Decl. ¶¶ 8-10, Exs. FF - HH; Wireman 2d Decl. ¶¶ 18-21, Exs. FF -HH; Lowry 3d Decl. ¶¶ 6-11, Exs. T-Z, AA – II, PP; Witte 5th Decl. ¶ 8 Exs. T-Z, AA – II, PP.

[39]  For Plaintiffs' effort to respond to this purported concern with at least 223 different time references, including dates, date ranges, and identification of necessary actions that were never performed on any date, *see e.g.* FAC ¶¶ 4, 8-10, 12-13, 15-16, 21-24, 26-28, 30-31, 33-34, 37, 39-41, 51-58, 61-64, 67-70, 72, 100, 106, 110, 112, 114, 120-21, 127, 129-30, 132, 134-35, 139, 146-49, 151, 153-54, 156, 159, 161, 163-64, 167; prayers 17-18, 20, 24; Appendix A (19 dates related to 9 patents obtained with improper listings); and Appendix B (123 different dates related to 119 works obtained with improper listings and/or sold with lack of proper notification and royalties to Plaintiffs).  See also the header for every claim and the content of the prayers.

[40]  For Plaintiffs' effort to respond to this purported concern, *see e.g.* FAC ¶¶ 4 ("Creative Period" defined), 10, 15-17, 22 ("Spill Date" defined).

[41]  For Plaintiffs' effort to respond to this purported concern, *see e.g.* FAC ¶¶ 22-24, 106. Plaintiffs, of course, allege that the Partnership remains in force and has not ended.

[42]  *E.g.* Docket Nos. 55, at 1, 1 n.1; 56, at 1, 1 n.1; Tr. 43:14-15 ("it is appropriate to plead a period of time and [Plaintiffs] have laid out cases that establish that").

[43]  *See also* ¶¶ FAC 52, 68-70 (pleading certain information and records are currently in the exclusive possession of Defendants; Defendant's scheme incepted on or about January 1, 2007 to February 28, 2008, and has operated as an ongoing scheme since that time; Defendants planned the conspiracy from January 1, 2007 until July 1, 2007).

author/inventor/ownership listings currently exist and what the listings should have said in order to be correct.[44]  *E.g.* Tr. 68:10-19.  Plaintiffs' counsel also understood the Court to indicate that the amended complaint needed to recite a date for when the spill occurred,[45] state a date for "when the partnership was entered into,"[46] and articulate Plaintiffs' allegation that the intellectual property was authored, invented and created in the "summer and fall" period of a year specified by Plaintiff.[47]  *See e.g.* Tr. 19:18-20; 68:21; 69:6-7.  The Court also indicated the need for "a short and plain statement of what was agreed to[[48]] and what you claim that Ms. Romero breached,[[49]] and if these other people helped her breach it so that somehow they are involved in a civil conspiracy or something that would make them liable under the civil law[[50]]," such as  "that they admitted that Ms. Romero didn't have any sewing skills, and that right there tells us that they were knowledgeable about Ms. Lowry's contribution, and they were involved in a scheme to deprive her of her just rewards from this invention[[51]]."  *E.g.* Tr. 69: 13-17.

   The Court further indicated that it preferred not to see case citations in the complaint.[52]  Plaintiffs' counsel also understood the Court to have indicated that Plaintiffs had described Mr. Ellis' profound injuries in unnecessarily "verbose and voluminous" detail in a large complaint paragraph referenced by the Court (i.e. Complaint ¶ 56).  Tr. 67:18-22 ("I don't know why we spend a page on Mr. Ellis's medical condition. . . . just take it [the "immaterial" "page-length"

---

[44]  For Plaintiffs' implementation, *see e.g.* FAC ¶¶ 12-15, Appendices A-B.

[45]  For Plaintiffs' implementation, *see e.g.* FAC ¶¶ 22.

[46]  For Plaintiffs' implementation, *see e.g.* FAC ¶¶ 22-24, 106.

[47]  For Plaintiffs' implementation to define the period of creative acts, *see e.g.* FAC ¶¶ 4 ("Creative Period" defined to include summer and fall of 2004), 10, 15-17, 22 ("Spill Date" defined).

[48]  For Plaintiffs' implementation, *see e.g.* FAC ¶¶ 23-28, 31.

[49]  For Plaintiffs' implementation, *see e.g.* FAC ¶¶ 12-13, 23-28, 31, 43-46, 50, 52-61, 63-66, 68-69, 71-72, 77, 81, 85-86, 89-90, 92-94, 96-97, 102-04, 111, 118-20, 125, 128, 133-136, 139, 144-46, 152-54, 156-57, 161, 166, Appendices A-B.

[50]  For Plaintiffs' implementation, *see e.g.* FAC ¶¶ 12-13, 50-57, 58, 60-61, 63-67, 69-70, 73-74, 77, 81, 85-86, 89-90, 92-94, 96. 97, 102-04, 146, 148, 156-57, 164-67, Appendices A-B.

[51]  For Plaintiffs' implementation, *see e.g.* FAC ¶¶ 20, 58.

[52]  Tr. 41:6-16.  Plaintiffs removed all case citations from the FAC.

complaint paragraph description] out"); Tr. 68:4.[53]  The Court also indicated "I hate to be that vague in my own assessment of it," but said there was a need for a "bare-bones complaint from which we can proceed" that was "more concise and more specific" and fifty pages in length.  Tr. 68:6, 71:2, 71:8-9.

In an effort to comply with all of the Court's directions, Plaintiffs re-drafted every paragraph of their original pleading.[54]  This included reluctantly cutting numerous paragraphs and detail in comparison to what was in the original complaint, and leaving out a lot of detail Plaintiffs would have included if afforded additional FAC space.[55]  Much of the available space

---

[53] Plaintiffs' implementation effort involved omitting the entire Complaint ¶ 56 from the new FAC, pursuant to the Court's guidance.  The FAC does not recite extensive detail about Mr. Ellis' condition, and makes only passing reference to his illness while alleging that "Romero's actions and omissions [in breach of her fiduciary duties] took unfair advantage of Plaintiffs, who had been rendered especially vulnerable by a series of devastating and distracting medical tragedies[.]" FAC ¶ 72.  This FAC ¶ 72 paragraph material was sourced, radically condensed, and clarified from other separate paragraphs found elsewhere throughout the original complaint, which the Court had apparently not criticized.  *Compare e.g.* Complaint ¶ 108, FAC ¶ 72.

[54]   The descriptions in this section concerning how the Plaintiffs understood the Court's directives and attempted to comply through alterations reflected in the FAC is also discussed at, *e.g.*, Witte 5th Decl. ¶¶ 4-32; Lowry 3d Decl. ¶¶ 4-12.

[55]  As Plaintiffs have noted on various occasions, they are willing and able to insert numerous additional details into any iteration of their complaint, including additional detail about virtually every aspect of their FAC, if the Court should at any time deem it necessary to do so.  *E.g.* Lowry 3d Decl. ¶ 12;  Witte 5th Decl. ¶¶ 8, 29-30, Exs. T-Z, AA – II, PP - OO.  Plaintiffs have already collected extensive evidence during investigation and have already placed extensive declarations and evidence on the record to demonstrate the bona fide viability of their claims. There is voluminous material and documentation that can be summarized for the FAC, added as appendices or exhibits to the FAC (including, e.g., photographs and drawings of the disputed works),  and added in whole or in part, as the Court may direct.  The only consideration that restrained Plaintiffs from inserting additional factual detail into the FAC was Plaintiffs' understanding of what the Court preferred in order to ensure that the FAC would have a reasonable length and format.  Starting with the original complaint and onward, Plaintiffs have attempted to include whatever level of detail the Court may require.  *See e.g.* Tr. 19:21-20:13; 39:5-7:

> That leads me to another point, Your Honor, which is if there are certain things that the Court believes we need to put in as dates, we can do that. I mean, there is lots of extra detail I could put into the complaint. I feel like it already has more than enough. You know, I could make it 200 pages and I could throw in . . . an official government record with official drawings with an official government record of when it was filed and when it was approved and so on. Every one of those dates -- we could put that in the complaint, and we're happy to do that, but then all you're doing is cluttering the complaint. I mean, we could put in attachments of all of those and we could throw in more dates, but I don't think it really adds to anything.

in the new FAC was consumed by new material the Court and/or Defendants' counsel had insisted upon, such as nine pages needed to describe a collection of creative and consultative work that had originally occupied two Binders, and several pages of space consumed in the process of inserting numerous references to dates and individual defendants throughout the FAC. Plaintiffs cut the number of claims from eighteen to sixteen for lack of space and edited down each claim, but even with these adjustments an additional nineteen pages were consumed for this purpose.  The twenty-six prayers associated with the claims were consolidated and cut to six pages.  Leaving aside any detailed description of the individual details for 119 disputed items potentially subject to copyright protection—as discussed in the next section—Plaintiffs were left with a total of about fourteen to fifteen pages to describe the terms of a verbal Partnership Agreement, set forth the winding history of the Partnership, explain the numerous acts of a conspiracy involving at least five malfeasors, and make various other esoteric pleading recitations necessary to support a collection of sixteen claims.

### 2) Logistical And Technical Challenges Encountered By Plaintiffs During Preparation And Filing Of The FAC

Plaintiffs' counsel encountered several difficulties just prior to the FAC filing deadline on May 21, 2012.  The first obstacle was that the Patent Office and Copyright Office required a long turnaround time for many of the requests, notwithstanding Plaintiffs' efforts to place orders for additional documentation soon after the Hearing.  The great bulk of the thousands of pages of material arrived only in the last week before the filing deadline.  These materials had to be reviewed, re-verified, and otherwise taken into account before the FAC was filed.  *E.g.* Lowry 3d Decl. ¶¶ 4-12; Witte 5th Decl. ¶ 25.

Plaintiffs' second difficulty originated from sweeping changes to Miche Bag's website initiated in June and July of 2011, including product depictions, that Defendants have asserted "were [innocently] made in the ordinary course of business" after Defendants had already

. . . .

There is certainly the ability to add more things, and if we had known that there was a concern about it, we would have voluntarily.

received notice of pending litigation from Plaintiffs. *E.g.* Docket No. 36, at 2-3 ("Miche Bag's website is regularly updated for marketing, promotion, sales, and other business-related purposes.")  Shortly prior to the May 21 deadline, Plaintiffs' counsel received new information from witnesses and the Copyright Office about a large additional collection of Miche Bag, LLC, "shell" visual art designs and associated copyrights that Defendants had apparently spoliated and otherwise concealed from the Miche Bag Website. *E.g.* Ballo 3d Decl. ¶¶ 4-12; Wireman 2d Decl. ¶ 22; Lowry 3d Decl. ¶¶ 4-12; Witte 5th Decl. ¶ 26.  One of the eyewitnesses had preserved old hardcopy Miche Bag catalogs in her personal possession, which contained photographs of designs which had been removed or made inaccessible on the current Miche Bag Website.  Ballo 3d Decl. ¶¶ 4-12, Exs. FF - HH.

This sequence of developments proved to be a Rosetta Stone of sorts.  By interpolating information from the eyewitnesses, the hardcopy catalogs, the Copyright Office, and the Plaintiffs' review, Plaintiffs' counsel became aware that there were far more than 18 copyrights improperly obtained by Miche Bag in connection with the Collection, and that the correct number of uncompensated designs used was at least 119.[56]  Witte 5th Decl. ¶ 27.  This information posed a dilemma, because the Court's apparent guidance about the FAC format rendered at the Hearing was based upon the Court's incorrect understanding that there were only 9 patents and 18 copyrights in dispute.  Tr. 7:17-18; 46:3-9; 68:5-19; Witte 5th Decl. ¶ 27. Plaintiffs discovered that in order to coherently provide the specific inventory of intellectual property information required by the Court—albeit for six times as many copyright registrations/items as the Court had originally contemplated—it was necessary to create a one-page table and a ten-page table and for inclusion of the listings as Appendices A-B at the end of

---

[56]  As noted on previous occasions, Defendants have demanded a very specific pleading of all disputed intellectual property, *e.g.* section I.B.1), *supra*, while simultaneously refusing access to the Binders and refusing to provide a comprehensive list of the intellectual property they claim to own in relation to the Collection, *e.g* Docket No. 37, at 3; Docket No. 75, at 3 Docket No. 62, at 46; 62, at 51; 71, at 4 (¶ 8).  Since Defendants removed much of the relevant information from the Miche Bag Website after receiving notice of litigation, Plaintiffs had to find an alternative means to complete the steps necessary for a more granular articulation of intellectual property in the FAC. *E.g.* Docket 31, at 5 (¶ 11); Docket No. 40-3, at 4 (¶ 10); Docket No. 32, at 3 (¶ 11); Ballo 3d Decl. ¶¶ 4-12; Wireman 2d Decl. ¶ 22; Lowry 3d Decl. ¶¶ 4-12; Witte 5th Decl. ¶ 26.

Plaintiffs' FAC.  Witte 5th Decl. ¶ 28-29.  If Plaintiffs left the specific information out of the FAC as required by the Court, or if Plaintiffs failed to file the FAC by the deadline specified by the Court, Plaintiffs risked potential legal difficulties.  Moreover, since the information came to light on the weekend just prior to the filing deadline, there was insufficient time for Plaintiffs to seek clarification or an extension of time from the Court prior to the deadline for filing the FAC. Witte 5th Decl. ¶ 29; Lowry 3d Decl. ¶¶ 4, 11-12.

Accordingly, a decision was made to file a FAC with complete required information by the deadline, but do so through use of a table at the end of the FAC.  In this way, the Court and opposing counsel would have all of the information that had been insisted upon in the Hearing, but additional modifications to the FAC could be readily made if the Court ultimately identified some other preferred way of reciting the information.  A brief email letter of explanation was submitted with the filing of the FAC to assure the Court that Plaintiffs remained committed at all times to conforming their filing to the Court's requirements, and that Plaintiffs' FAC represented their  best effort to do so under the unanticipated circumstances.   Lowry 3d Decl. ¶¶ 11-12, Ex. OO; Witte 5th Decl. ¶¶ 28-30, Ex. OO.

The third difficulty associated with filing the FAC arose from the fact that McCormick Barstow LLP had scheduled a once-in-decade, firm-wide upgrade to the firm's computer operating system, document management system, Microsoft Office software, and document templates, which had to be implemented from May 17-21.  Witte 5th Decl. ¶ 31-32 (all information in this paragraph).  This, in turn, necessitated extensive computer training and navigation of numerous transitional difficulties related to both technical malfunctions and the learning curve for users.  In order to avoid any catastrophic last-minute mishap with filing the FAC under such circumstances, Plaintiffs' counsel arranged to use his own off-system residential computer to continue drafting the FAC during the five days[57] immediately prior to the May 21 deadline.  When the FAC was brought in to the firm office on May 21 and printed the firm's new

---

[57]   The five day stretch included May 19-20, 2012, since Plaintiffs' counsel had to work on the FAC throughout the weekend to distill and incorporate all of the late-breaking information.  *E.g.* Witte 5th Decl. ¶ 28; Lowry 3d Decl. ¶ 11.

and updated computer system, the automatically reformatted FAC document accidentally expanded 1.2 pages in length beyond the 50 that had been contemplated.  By that point, however, Plaintiffs' attorney was scrambling to resolve unanticipated difficulties with his ECF account access, and he barely managed to get the issues resolved before the close of business so that the FAC could be filed in any form.  Immediately after filing, Plaintiffs' counsel then spent the late evening resolving a second litigation emergency that had emerged on the same day in an unrelated matter.

Notwithstanding all of these obstacles, Plaintiffs' counsel filed the FAC by the deadline.

### C.    Stipulation Between Plaintiffs And Defendants

Defendants received Plaintiffs' FAC.  On June 4, 2012—which was two days prior to Defendants' deadline for filing a response to the FAC—Plaintiffs' counsel received a request from all of the Defendants for a stipulation to extend time.  Plaintiffs' counsel indicated Plaintiffs were willing to stipulate to an extension of time for either an answer or for any motion based upon grounds for dismissal as specified in FRCP 12(b), but were not willing to endorse any extension of time for assertion of FRCP 8 arguments.[58]  Witte 5th Decl. ¶ 33.

---

[58]    As previously explained to the Court, Plaintiffs have a long-running concern about the possibility of ongoing fraud, fraudulent conveyances, spoliation of evidence, and other prejudicial developments by Plaintiffs.  Docket Nos. 30, at 6-8; 45, at 3-6; *see also e.g.* Docket Nos. 29-1 through 33-2, 36-1 through 36-5; 40 through 41-5, 45 through 45-1; Ex. 1 (Wireman Decl. ¶¶ 4-10); Ex. 2 (Ballo Decl. ¶¶ 5-13); Ex. 3 (Ballo 2d Decl. ¶¶  6-13); Ex. 4 (Lowry Decl. ¶¶ 10-11); Ex. 5 (Lowry 2d Decl. ¶¶ 6-10; Ex. 6 (Witte Decl. ¶¶ 6-17); Ex. 7 (Witte 2d Decl. ¶¶ 6-11, 15); Ex. 8 (Witte 3d Decl. ¶¶ 5-16); Ex. 9 (Witte 4th Decl. ¶¶ 3, Exhibit R); Ex. 10 (Corbin Decl. ¶¶ 22-25); Ex. 11 (Engerman Decl. ¶ 7); Ex. 12 (Gardner Decl. ¶ 10); Ex. 13 (Patton Decl. ¶ 5); Ex. 14 (Reymann Decl. ¶¶ 4, 6, Exhibit 1); Ex. 15 (Reymann Errata Decl. ¶ 6); Ex. 16).

Such mischief would be inherently facilitated by what Plaintiffs consider to be Defendants' dilatory delay tactics in this case.  Plaintiffs have also previously taken the position that the appropriate non-dilatory approach for resolving purported FRCP 8 concerns is for the parties to meet and confer, with Defendants litigating by motion only those clarifications that have been specifically requested by the Defendants for voluntary modification and then refused by Plaintiffs.  *See* Docket Nos. 55, at 37-38 (quoting *Simaan, Inc. v. BP Products N. Am.*, 395 F.Supp.2d 271, 278-80 (N.D.N.C. 2005; *Stromillo v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 54 F.R.D. 396, 396-98 (E.D.N.Y. 1971)); 56, at 37-38 (same); Tr. 39:5-7 ("There is certainly the ability to add more things, and if we had known that there was a concern about it, we would have voluntarily.").  Witte 5th Decl. ¶ 34.

Plaintiffs' concern was that voluntarily and affirmatively endorsing extensions of time for Defendants to delay progress through additional FRCP 8 efforts might be later be construed to undermine or waive Plaintiffs' arguments (some of which are as yet unripe).  *Cf.* Docket No. 98,

Defendants grumbled about Plaintiffs' terms for the stipulation, but agreed.  Witte 5th Decl. ¶ 33, Ex. NN; Docket No. 92.  The stipulation was signed by all of the parties and submitted to the Court for review and possible approval.  Docket Nos. 92, 92-1.  However, the Defendants failed to obtain the Court's consent for any extension prior to the original deadline of June 7, 2012, and also failed to file anything before the governing deadline elapsed.  These circumstances persisted until June 12, 2012, when the Court entered an order extending a reprieve to Defendants so long as Defendants filed consistent with the terms of the original stipulation.  Docket No. 93.

The Defendants subsequently filed their motions with FRCP 8 arguments, notwithstanding the stipulation terms.  Docket Nos. 96, at 3, 10; 98, at 2-3; 99, at 1.  Defendants predicated their request on an argument that the Court should adopt a strict approach against Plaintiffs, who had submitted their FAC filing on time but experienced technical and logistical difficulties in the process of doing so.[59]  Docket Nos. 96, at 3, 10; 98, at 2-3; 99, at 1.

---

at 4 ("The Company Defendants have chosen to move forward to address the questionable merits of Plaintiffs' claims only in the interest of expediting this unnecessarily burdensome and paper-laden litigation."); Witte 5th Decl. ¶ 34.  Of course, Defendants were in a position to seek the Court's consent for an extension and countenance only a technical expression of opposition from Plaintiffs for purposes of reserving Plaintiffs' rights, but Defendants did not do so.  Witte 5th Decl. ¶ 34.

[59] *See* section I.B.2), *supra*.

## II.  **LEGAL ARGUMENT**

As reflected by the previous Facts section, the FAC sets forth ample factual detail in all respects and as needed for each and every claim.[60]  Moreover, as explained in more detail below, Defendants entered into a stipulated waiver of arguments for dismissal not based upon a ground set forth in FRCP 12(b).  Furthermore, even if, arguendo, the Defendants are found not to have waived any legal arguments they now assert, none of Defendants' arguments have substantive legal merit.  The FAC pleading is legally and factually sufficient to provide basic notice about viable claims.  None of the FAC claims are defective, preempted, or impermissibly duplicative.

### A.  **Standard of Review**

When reviewing a FRCP 12(b)(6) motion, a district court accepts all well-pleaded facts as true and views them in the light most favorable to the plaintiff.  *Jordan-Arapahoe, LLP v. Board of County Com'rs*, 633 F.3d 1022, 1025 (10th Cir. 2011).  "To survive a 12(b)(6) motion to dismiss, a plaintiff must allege that []enough factual matter, taken as true, [makes] his []claim to relief . . . plausible on its face.[]"  *Id.* (citations omitted).

### B.  **Neither the Copyright Act Nor The Patent Act Preempts Any State Claim**

Defendants' arguments for dismissal of the FAC state claims rely heavily on a fundamentally flawed notion that such claims are preempted by the Copyright Act and the Patent Act.  Docket Nos. 96, at 3, 15-16; 98, at 8-13.  As explained below,[61] Defendants are incorrect.

---

[60]  This Opposition explicitly relies upon, and has ECF links to, inter alia, all of the supporting exhibits previously found at Docket Nos. 57-73 and all other exhibits and declarations referenced by a specific docket citation.  Additional new supporting exhibits have also been filed.

[61]  Plaintiffs' preemption analysis will be explained once, as set forth in this section, rather than repeated in full for the discussions associated with each separate FAC state claim.  The basic preemption analysis applies to every state claim and Plaintiffs assert it in connection with their defense of each and every state claim challenged by the Defendants.

### 1)   The Copyright Act Does Not Preempt Any FAC State Claim

Defendants correctly recite the basic principle that the Copyright Act exclusively governs a claim when: "(1) the work is within the scope of the subject matter of copyright as specified in 17 U.S.C. §§ 102 and 103; and (2) the rights granted under state law are equivalent to any exclusive rights within the scope of the federal copyright as set out in 17 U.S.C. § 106."[62]  The "scope" test and "equivalency" test must *both* be met to trigger preemption of a state claim.

The threshold "scope" requirement for Copyright preemption cannot possibly be satisfied unless the "state law claim . . . involve[s] acts of reproduction, adaptation, performance, distribution, or display."  *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir. 2004).  Furthermore, even if this first threshold is met, the second essential preemption requirement known as "equivalence" is not present if the state cause of action "requires an extra element, beyond mere copying, preparation of derivative works, performance, distribution or display[.]"  *Gates Rubber Co.*, 9 F.3d at 847; *see also Briarpatch Ltd., L.P.*, 373 F.3d at 305. Even if there is an overlap as to scope, any such "extra element"[63] renders the state cause of action "qualitatively different from, and not subsumed within, a copyright infringement claim and federal law will not preempt the state action."  *Gates Rubber Co.*, 9 F.3d at 847.

As Defendants implicitly acknowledge,[64] Defendants' own line of cases specifically clarifies that Plaintiffs' state law claims are *not* preempted under the foregoing analysis.  There is

---

[62] Docket No. 98, at 8 (citing *Harolds Stores, Inc. v. Dillard Dep't Stores*, 82 F.3d 1533, 1542-43 (10th Cir. 1996) (quoting *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 847 (10th Cir. 1993); *see also* 17 U.S.C. § 301).

[63] The equivalence test does not focus on "the conduct alleged to support the two [compared] causes of action" or compare "the facts pled to prove them"; instead, it compares only the formal prima facia "elements of the causes of action."  *Harolds Stores, Inc.*, 82 F.3d at 1533, 1543 (state cause of action validly asserted for copyrighted fabric patterns copied by competing store).

[64] *See* Docket No. 98, at 9 (citation omitted) ("fraud claims are not automatically preempted by the Copyright Act" but a fraud claim is preempted if it is "a 'disguised copyright claim'" so that "sole basis of the fraud claim is that a defendant represented materials as his own").

2

no preemption if the state claim requires "that the plaintiff show a breach of trust or confidence," including any breach of fiduciary duty.[65] Likewise, there is no preemption if "the underlying right [plaintiffs] seek to vindicate is the right to redress violations of the duty owed to a partnership by those who control it," even if the partnership and the related claims focus on creation of a work subject to copyright. *Briarpatch Ltd., L.P.*, 373 F.3d at 307; *Oddo v. Ries*, 743 F.2d 630, 633, 635 (9th Cir. 1984).   Furthermore, state law partnership and equity claims intertwine with and inform federal copyright principles in disputes involving partnership copyright ownership and accounting, and are not categorically preempted by copyright law. *Oddo*, 743 F.2d at 633, 633 n.2.

In addition, state actions for fraud, unjust enrichment, and tortious interference with economic relations are not preempted if directed at actions or harms that are different than or in addition to the mere copying, performance, distribution, or display of  work, or preparation of a derivative work.[66]   Unjust enrichment will not be preempted to the extent it is focused on recovery for enrichment different than or beyond mere copying, preparation of derivative works, or the performance, distribution or display of a work.  *Briarpatch Ltd., L.P.*, 373 F.3d at 306-07. Copyright does not, for example, preempt unjust enrichment related to uncompensated use of

---

[65] *E.g. Gates Rubber Co.*, 9 F.3d at 847; *Briarpatch Ltd., L.P.*, 373 F.3d at 305; *see also R.W. Beck, Inc. v. E3 Consulting, LLC*, 577 F.3d 1133, 1147, 1149 (10th Cir. 2009) (state trade-secret misappropriation claim not preempted because the "third element, proof of a breach of trust or confidence, 'qualitatively distinguishe[d] such trade secret causes of action from claims for copyright infringement . . . based solely on copying'"; Beck failed to qualify because he did not allege misappropriation of methodology, techniques, goodwill, or physical deprivation of notes).

[66] *Briarpatch Ltd., L.P.*, 373 F.3d at 300, 306-07 (entertaining claims alongside copyright for "fraud and fraudulent concealment, breach of fiduciary duty, conversion and trover, unjust enrichment, and an accounting"); *Telecom Tech. Serv. Inc. v. Rolm Co.*, 388 F.3d 820, 833 (11th Cir. 2004) (allowing tortious interference claim); *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1305 (D.C. Cir. 2002) (tortious interference claim allowed because defendant's alleged interference was through conduct not limited to mere "'reproduction[,] . . . preparation[,] . . . distribution[,] . . . performance[,] . . . or display" of the copyrighted work.'").

marketing and business plans, research, consultative expertise, or artifacts.[67]

Consistent with the analysis above, the FAC is replete with, inter alia, articulation of acts that do not even include reproduction, adaptation, performance, distribution, or display; with articulation of claims that involve "an extra element, beyond mere copying, preparation of derivative works, performance, distribution or display"; and with harms and requests for relief of a nature that are not merely limited to copying, preparation of derivative works, performance, distribution or display.[68]   The FAC thus articulates valid state claims along with the other valid claims governed by the federal Copyright Act.[69]

---

[67] Defendants rely upon *Seng-Tiong Ho v. Taflove*, 648 F.3d 489 (7th Cir. 2011), Docket No. 98, at 9-10, but the disputed subject matter and the pleading errors involved in that case make it readily distinguishable. *Seng-Tiong* involved a professor who developed a mathematical model for mimicking particle behavior in a photonic device. *Id.* at 493, 498. The model had "no known commercial use" and thus could not be used to directly enrich anyone in a monetary sense. *Id.* at 493. One of the professor's graduate students subsequently moved to a different research team and published works which plagiarized the professor's academic ideas and mathematical formulas as set forth in the model. *Id.* at 494. However, the team merely "copied the *substance* of the equations, figures and text"; there was no copying of any *specific expression* or presentation of those ideas created by the professor himself (such as specific explanatory wording, patterns, designs, or visual diagrams). *Id.* at 499. The professor testified that "no items had been physically taken from him" such as notebooks or other physical research materials, and he neglected to allege promissory fraud in relation to the empty assurances of his departing graduate student. *Id.* at 496, 502, 503 n.11. Under that unique combination of facts—none of which apply in the present litigation—the *Seng-Tiong* Court found that the professor was attempting to copyright "'unprotectable concepts, ideas, methods, procedures, processes, systems, and/or discoveries'" and that the federal copyright merger doctrine applied because there were limited ways of mathematically expressing the ideas of the model. *Id.* at 494, 499. The federal merger doctrine had preemptive effect against state claims. *Id.* at 495.

[68] *See e.g.* FAC ¶¶ 4, 27, 31, 34, 48, 76, 78, 110, 118, 119, 120, 121, 126, 127, 129, 130, 132, 134, 135, 139, 140, 144, 145, 146, 147, 149, 151, 154, 156, 161, 162, 163, 166, 167; Prayers 1, 4, 7, 8, 9, 17, 18, 19, 20, 21, 24, 25.

[69] *See also Foley v. Luster*, 249 F.3d 1281, 1289 (11th Cir. 2001) (allowing indemnity claim); *Wood v. Houghton Mifflin Harcourt Pub. Co*, 589 F.Supp.2d 1230, 1253-54 (D. Colo. 2008) (allowing fraudulent concealment); *Integrative Nutrition, Inc. v. Academy of Healing Nutrition*, 476 F.Supp.2d 291, 298 (S.D.N.Y.2007) (allowing fraud and misrepresentation); *Dorsey v. Money Mack Music, Inc.*, 304 F.Supp.2d 858, 863-67 (E.D. La. 2003) (allowing accounting, breach of fiduciary and contractual duties, contractual rescission, unjust enrichment, conversion, declaratory judgment); *Asunto v. Shoup*, 132 F.Supp.2d 445, 451-53 (E.D. La. 2000) (allowing accounting, breach of contractual and fiduciary duty, conversion, unjust enrichment, declaratory relief); *Howard v. Sterchi*, 725 F.Supp. 1572, 1578-79 (N.D. Ga. 1989), *aff'd* 12 F.3d 218 (11th Cir. 1993) (allowing unjust enrichment, breach of contract, breach of covenant of fair dealing).

## 2) __The Patent Act Does Not Preempt Any State Claim__

Defendants also erroneously assert that "[b]ecause the issue of inventorship is an area exclusively occupied by federal law, and because each of Plaintiffs' state law claims is premised on assertions of inventorship, those claims are field preempted." Docket No. 98, at 11.

"[P]atent laws will not preempt [state] . . . claims if they include additional elements not found in the federal patent law cause of action and if they are not an impermissible attempt to offer patent-like protection to subject matter addressed by federal law." *Rodime, PLC v. Seagate Tech, Inc.*, 174 F.3d 1294, 1306 (Fed. Cir. 1999). Tortious interference with economic relations and claims akin to unfair competition are explicitly *not* preempted by patent law. *Id.*, at 1306; Docket No. 98, at 13 ("not all tortious interference claims are preempted by the Patent Act").

Along similar lines, state law claims that are "not simply an attempt to enforce property rights"—such as a "fraudulent nondisclosure claim spring[ing] from [defendant's] alleged duty to inform the [plaintiffs] of the patent application" or an "unjust enrichment claim spring[ing] . . . from [defendant's] alleged wrongful use of the [Plaintiffs'] research results"—will not be preempted.[70] Litigants in a patent ownership dispute may permissibly invoke state claims for fraud, unjust enrichment, and tortious interference.[71] Furthermore, state causes of action such as

---

[70] *Univ. of Colo. Found., Inc. v. Am. Cyanamid Co.*, 196 F.3d 1366, 1371-72 (Fed. Cir. 1999) ("*Cyanamid IV*"); *Massachusetts Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 67 (1st Cir. 2009) (same; adding that "[c]ourts . . . have permitted disgorgement of the malefactor's profits as a remedy for unjust enrichment in patent disputes").

[71] *Fenn v. Yale University*, 283 F.Supp.2d 615, 628-40 (D. Conn. 2003) (entertaining these three footnoted state claims with the federal patent ownership dispute; also rejecting waiver, estoppel, unclean hands, negligence, and statute of limitations defenses due to faculty member's failure to affirmatively disclose patent developments and market value of the invention as required by his fiduciary relationship); *see also Fenn v. Yale University*, 393 F.Supp.2d 133, 140-43 (D. Conn. 2004), *further additional findings*, 2005 WL 327138 (2005), *aff'd* 184 Fed. Appx. 21 (2d Cir. 2006) (applying *Cyanamid VI* to find state claims not preempted by patent law).

*See also Brigham Young University v. Pfizer, Inc.*, 2012 WL 918744 *5, 5 n.31 (D. Utah) (applying Missouri state joint venture and fiduciary duty law to patent dispute; ruling that a jury needed to review "the actions and conduct of the parties" to determine if "implied agreement" existed and breach of fiduciary duty had occurred). *Tavory v. NTP, Inc.*, 297 Fed.App'x 976,

fraudulent nondisclosure and unjust enrichment will not be preempted by the Patent Act, unless such claims are invoked in a way that interferes with federal patent uniformity through use of a state action to "dictat[e] standards for inventorship[.]"[72]

The Plaintiffs here are not attempting to dictate inventorship standards through substitution of a state law standard, nor have Plaintiffs stated causes of action that would imperil uniformity in the application of federal patent law.  Instead, Plaintiffs allege that they were harmed because, inter alia, their physical Binder artwork was taken; their marketing and business plans therein were taken and utilized without compensation or consent; their business and product research in the Binders were taken and utilized without compensation or consent; the Partnership and its goodwill were harmed by conspiratorial betrayal and interference by Defendants; agreements involving confidentiality and reliance were violated; Plaintiffs were not compensated for their labor expended to create the physical Drawings and Prototypes; and

---

983 (Fed. Cir. 2008) (unpublished), is not to the contrary.  *Tavory* involved a summary judgment motion where discovery failed to yield evidence of inventorship.  *Id.* at 978, 981.  The *Tavory* court noted that a plaintiff may permissibly invoke unjust enrichment and other state claims to "deprive a [defendant] of an unfair benefit [defendant] gained by breaching the [plaintiff's] confidence" in connection with physical manuscripts and research, s*ee id.* at 983, but Tavory was unable to allege a relevant breach of confidence, misuse of physical artifacts, or research use.

[72] *Cyanamid IV*, 196 F.3d at 1371-72, 1375 (citation omitted) (opinion considered both patent and copyright issues, and found no preemption of state claims: "The fraudulent nondisclosure and unjust enrichment causes of action cover a broad range of conduct that does not bear on federal patent policies, and those causes of action are therefore not preempted by federal patent law. Nor are the state law causes of action preempted as applied in this case, because the two state law causes of action do not impose requirements that are inconsistent with federal law, nor do they 'stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"); *Univ. of Colo. Found., Inc. v. Am. Cyanamid Co.*, 342 F.3d 1298, 1304-06 (Fed. Cir. 2003), *cert. denied,* 541 U.S. 988 (2003)  ("*Cyanamid VI*") ($23,243,228 "incremental profit" award for state unjust enrichment claim could be awarded in addition to federal equitable remedy reforming patents to the true and equitable titleholders; unjust enrichment award for wrongful use of research results was not "patent-like" and would not be preempted; trial court properly permitted $22,546,000 damages on state fraud claim and then offset the fraud damages against unjust enrichment damages to prevent double recovery; federal equitable remedy was a third "separate and independent ground" for ordering disgorgement of incremental profits; fact that research was not protected as "trade secret" did not prevent unjust enrichment recovery); *Russo v. Ballard Med. Products*, 550 F.3d 1004, 1015-1016 (10th Cir. 2008) (allowing trade secret misappropriation, unjust enrichment, based upon *Cyanamid VI* ).

Plaintiffs were deprived of various opportunities that did not stem from the Collection patents and patent royalties per se.[73]  In other words, Plaintiffs' state law claims are designed to recover for benefits accrued to Miche and the other Defendants beyond the falsified patents per se, and for harms inflicted upon Plaintiffs that extend beyond any patent issues or remedies per se.

**3)**    **Trade Dress Claims And Issues Are Not Preempted By The Copyright Act Or The Patent Act**

Defendants assert that Plaintiffs' claims related to trade dress are "preempted by federal patent and copyright laws" because Plaintiffs are also asking the Court "to declare inventorship and/or authorship of 'the Collection[.]'"  Docket No. 96, at 9.  However, consideration of trade dress claims and issues does not run afoul of the preemption tests for either the Copyright Act or the Patent Act.  Trade dress, copyright, and patent are entirely different legal concepts distinct in terms of scope, duration, qualitative characteristics, and analytic legal considerations.[74]

**C.**    **Claim Thirteen For Fraud Is Adequately Pled In All Respects**

Plaintiffs have asserted a claim against all of the Defendants for fraudulent concealment as achieved through their common conspiracy.  As the analysis below explains, the Defendants

---

[73] *See e.g.* FAC ¶¶ 4, 27, 31, 34, 48, 76, 78, 110, 118, 119, 120, 121, 126, 127, 129, 130, 132, 134, 135, 139, 140, 144, 145, 146, 147, 149, 151, 154, 156, 161, 162, 163, 166, 167; Prayers 1, 4, 7, 8, 9, 17, 18, 19, 20, 21, 24, 25.

[74] *See e.g. Ashley Furniture Indus., Inc. v. SanGiacomo N.A. Ltd.*, 187 F.3d 363, 376 (4th Cir. 1999) (explaining the coexistence of trade dress, copyright, design patents, and utility patents); *Kohler Co. v. Moen, Inc.*, 12 F.3d 632, 638 (7th Cir. 1993) ("courts have consistently held that a product's different qualities can be protected simultaneously, or successively, by more than one of the statutory means for protection of intellectual property"); *American Dental Ass'n v. Delta Dental Plans Ass'n*, 126 F.3d 977, 980 (7th Cir. 1997) (discussion about trade dress); *Magical Mile, Inc. v. Benowitz*, 510 F.Supp.2d 1085, 1089-90 (S.D. Fla. 2007) (trade dress has elements wholly different from copyright and is not preempted); Julia A. Matheson & Stephen L Peterson, *Combine and Conquer: How the Synthesis of Design Patent and Trade Dress Achieve Maximum Protection for Your Product Design*, FINNEGAN (May 2009), at http://www.finnegan.com/resources/articles/articlesdetail.aspx?news=74f843be-c63a-40cc-8ae0-007bc50fdd99 (namely design patents, trade dress, and copyright).  Indeed, as plaintiff in *Miche Bag, LLC v. Be You, LLC*, Case No. 1:09-cv-14256-TLL-CEB (E. D. Mich, March 16, 2010), Miche Bag filed a First Amended Complaint against an alleged maker of copycat purse products with claims for patent, copyright, trade dress, and the Michigan Consumer Protection Act.

other than Romero—meaning Church, Seegmiller, Cavaness, and Miche Bag—are liable for fraudulent concealment by virtue of the conspiracy they formed with Romero.

### 1)   Romero's Role In The Fraudulent Conspiracy

Defendants assert that Claim Thirteen is "bewildering" and does not articulate a valid claim.[75]  Defendants are mistaken, and Claim Thirteen is viable in all respects.

As Defendants correctly concede, a claim for fraudulent concealment is established if Plaintiffs set forth facts alleging: (1) there is a legal duty to communicate information, (2) the nondisclosed information is known to the party failing to disclose, and (3) the nondisclosed information is material.[76]

With respect to element (1), the FAC alleges that Romero was, inter alia, a partner to Lowry, a fiduciary in several different capacities to both Lowry and Ellis, and a bailee and custodian of the Binders for the Partnership and the Plaintiffs.[77]  *E.g.* FAC ¶¶ 24-28, 30, 50, 118-

---

[75]  According to Defendants, Plaintiffs' Claim Thirteen is "bewildering" and does not satisfy the requirements of FRCP 8(a) and 9(b).  Docket No. 96, at 3, 18.  "At the same time, the Thirteenth Claim is unclear and unspecific and fails to meet the requirements of F.R.C.P. 8(a), that the pleader set forth a 'plain statement of the claim."  Docket Nos. 96, at 18; 98, at 4.  Plaintiffs disagree.  *See* section I.A.5), *supra*, and the explanation in this section.  Moreover, to the extent, arguendo, that more detail or additional allegations would be helpful or necessary, Plaintiffs would respectfully request an opportunity to do so and to be allowed commensurate additional space available in the FAC for fraud and any other supposedly defective statement of claim.  Recitation in all of the claims, including fraud, was more terse than Plaintiffs would have preferred, due to the overall page limitation imposed.

[76]  Docket Nos. 96, at 10 (citing *Yazd v. Woodside Homes Corp.*, 2006 UT 47, P35, 143 P.3d 283, 289 (Utah 2006)); 98, at 4 ("a defendant owed a plaintiff a duty to disclose material information and failed to do so").

[77]  As explained herein, Romero's fraudulent concealment included both affirmative acts and impermissible omissions.  Plaintiffs allege that Romero entered into an agreement with Plaintiffs and thereby assumed various fiduciary responsibilities over them, including but not limited to fiduciary duties as a partner within the Partnership.  Romero had an affirmative duty to notify Plaintiffs about any developments involving the Collection as depicted in the Binders entrusted to Romero.  Not only did Romero fail to make affirmative disclosures as required pursuant to her duties as a partner (by concealing positive test market results, business opportunities, contracts regarding the Collection entered into with respect to third parties, intellectual property filings, etc.), she also engaged in affirmative efforts to conceal information from the Plaintiffs (such as telling Miche Bag distributors various fabricated stories about the origin of the Collection in 2009).  In addition, Romero misused her authority by creating an impasse situation where the

120, 126, 141, 144-47.  The FAC explains Romero owed duties to the Plaintiffs, explains what duties were involved, and also sets forth when, how, and where the duties arose. *Id.*  With respect to element (2), the FAC alleges that between January 1, 2007, and February 28, 2008, Romero entered into a specifically detailed conspiratorial scheme with the other Defendants to intentionally utilize the Collection and other Binder information without disclosure to Plaintiffs, and from that Inception period and onward implemented the scheme through, inter alia, use of the Workman Nydegger law firm in Salt Lake City.  *E.g.* FAC ¶¶ 52-61, 70-71, 141, 147-48. Romero concealed from Plaintiffs all of these developments, as well as, inter alia, the positive test-marketing results obtained in 2007, *e.g.* FAC ¶ 54; the potential opportunities with Wal-Mart and Target in 2008, *e.g.* FAC ¶ 53; the profits from use of the Collection achieved on an ongoing basis after 2007, *e.g.* FAC ¶ 53; and various other information of a material nature as required for element 3) of fraudulent concealment[78].

Romero had a legal duty to act loyally and to timely communicate information to Plaintiffs regarding, inter alia, the 2007 test marketing results and the fact that Romero and her co-conspirators were utilizing the Binder contents (including accumulated marketing plans, business plans, designs, consulting research, and product ideas not relating to copyright or patent law or necessarily amenable to such registrations[79]) for unapproved purposes and without any compensation to Plaintiffs.  Romero knew that the improper activity was occurring—and in fact,

Partnership was unable to move forward legally or financially without Romero's cooperation, which cooperation Romero tactically withheld as part of a ruse designed to buy time for Romero and the other Defendants to make undisclosed intellectual property filings while also gaining a surreptitious competitive market head start against the Partnership.

[78] *E.g.* FAC ¶¶ 52-61, 64, 70-72, 141, 144-48; *Fenn*, 283 F.Supp.2d at 632-33.

[79] *E.g.* FAC ¶¶ 4 (Binders contained "legal documents; products; product and market research; marketing, business, and product production plans . . . and other content"), 24 ("Plans, research, notes, legal agreements, and other materials"), 27 ("storing and safeguarding the Prototypes, Drawings, research results, notes, Plans, legal documents, Binders, and other physical property of the Partnership"), 31 ("information about fashion distribution, sources of business funding, and other practical business considerations" from consultants), 34 ("potential marketing plan").

9

affirmatively helped execute and conceal the conspiratorial activities while manipulating Plaintiffs who were relying upon her honesty—but failed to make disclosure to Plaintiffs.  *E.g.* FAC ¶¶ 52-61, 70-71, 141, 147-48. The nondisclosed information was clearly material, since Romero failed to reveal developments and a conspiratorial scheme designed to directly destroy the benefit of the bargain struck between Romero and Plaintiffs, and Plaintiffs would not have allowed Romero to have or continue to use the Binder contents if Plaintiffs had been told the truth about what was occurring.  FAC ¶¶ 26, 28, 139, 141.

To the extent, for example, that Romero made revenues by utilizing contents of the Binder through fraudulent concealment in violation of her fiduciary duties—and/or to the extent that Plaintiffs suffered harm or find they need equitable remedies because of use of such content falling outside the ambit of federal law preemption—Plaintiffs are entitled to such remedies on account of fraudulent concealment principle under Utah law as articulated by Defendants.[80]  The same is true with respect to the harm Romero inflicted upon the Partnership and upon Plaintiffs' ability to fund and sell other products and business services.

With Romero's fraud explained, the analysis next turns to Romero's co-conspirators.

### 2)    Liability Of Defendants Other Than Romero For Participating In The Fraudulent Conspiracy

It is well established that a co-conspirator can be held jointly liable for the harm caused by the conspiracy, even if a) some co-conspirators played more important roles in some aspects of the scheme than other co-conspirators, and/or b) only one of the co-conspirators had the fiduciary relationship with the victim that was abused in furtherance of the conspiratorial

---

[80]  Docket No. 96, at 10 (citing *Yazd*, 143 P.3d at 289); *see also Gates Rubber Co.*, 9 F.3d at 847; *Briarpatch Ltd., L.P.*, 373 F.3d at 300, 305-07 (entertaining claims alongside copyright for "fraud and fraudulent concealment, breach of fiduciary duty, conversion and trover, unjust enrichment, and an accounting"); *Oddo*, 743 F.2d at 635 (same).

scheme.[81]   The FAC alleges that the other Defendants knew[82] about Romero's fraud, and

deliberately cooperated to help Romero accomplish and conceal the scheme.[83]   This included

coordinated, intentional, malicious, and concealed misuse of Romero's fiduciary relationship to

manipulate Plaintiffs in furtherance of Defendants' collective objectives.   FAC ¶¶ 12-15, 52-61,

70, 73-74, Appendices A-B.   Thus, the Defendants other than Romero err in supposing that they

cannot be held liable for fraudulent concealment along with Romero herself, simply because they

"have never met or spoken to the Plaintiffs" or because Romero was the only defendant who had

fiduciary duties directly toward the Partnership and the Plaintiffs.   Docket No. 98, at 5.

   For Miche Bag per se, the prospect for evading liability in connection with fraud (and

---

[81]   *E.g. Farm Bureau Life Ins. Co. v. American Nat. Ins. Co.*, 505 F.Supp.2d 1178, 1189-90 (D. Utah 2007) (citation omitted) ("'[f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself'"); *United States v. Rivieccio*, 846 F.Supp. 1079, 1085-86 (E.D.N.Y. 1994) ("'[a] conspirator is a conspirator whether he plays a major role or a minor role in the illicit activity'"; "[a]ny one who knowingly participates with a fiduciary in a breach of trust is liable for the full amount of the damage caused thereby"); *Sadarangani v. Bank of America*, 2009 WL 2175631 * 2 (S.D.Fla.) (unpublished) (bank liable for embezzlement committed by employee; opinion also noted that an employer could be held liable for employee who stole proprietary blueprints from another company without employer's knowledge and in violation of employment contract); 37 Am. Jur.2d Fraud and Deceit § 306 ("a breach of a fiduciary duty is actionable against the breaching party and any third party who knowingly aids and assists in its breach").

[82]   Miche Bag, Church, and Seegmiller, have, unlike Cavaness, represented that they had no knowledge about Plaintiffs or the Partnership.   Tr. 8:11-15 ("In 2007 my client, in an arm's length transaction with Ms. Romero and Ms. Cavaness, Mr. Burton's clients, purchased I.P. rights from Ms. Romero and Ms. Cavaness. They are a bona fide purchaser. They had no knowledge of the plaintiffs' claims to ownership of any of the intellectual property."); Docket No. 98, at 2-3 ("until receiving Plaintiffs' pre-litigation demand letter in June 2011, the Company Defendants had no idea that Plaintiffs even existed").   Due to, inter alia, the facts described in section I.A.5), *supra*, Plaintiffs believe these representations about a lack of knowledge are knowingly false; be that as it may, it is a disputed issue for the jury to decide.

In addition, the FAC alleges that Defendants were notified about the Plaintiffs' concerns on July 28, 2011, but have nonetheless persisted in their ongoing pattern of wrongful, fraudulent, tortious, unjust, and conspiratorial conduct.   *E.g.* FAC ¶¶ 60, 67-70, 74, 77-78, 83, 102.

[83]   *E.g.* FAC ¶¶ 52-61, 70-71, 141, 147-48 (between January 1, 2007, and February 28, 2008, Romero entered into a specifically detailed conspiratorial scheme with the other Defendants to intentionally utilize the Collection and other Binder information without disclosure to Plaintiffs, and from that Inception period and onward implemented the scheme through, inter alia, use of the Workman Nydegger law firm in Salt Lake City; planning occurred January to July, 2012.)

other tortious and wrongful conduct committed by the other Defendants) is especially bleak.

Even accepting Church's own representations at face value,[84] Romero was at minimum an

"employee" of Miche Bag when (without limitation or exclusion) Romero was enriching Miche

Bag through her ongoing wrongful acts and omissions against Plaintiffs and the Partnership.

Well-established Utah law—which is similar to the law in most other jurisdictions—provides

that under the kind of circumstances present in this case, a legal entity will be imputed with the

knowledge and wrongful acts of its employees, officers, directors, and founders.[85]

---

[84] Docket No. 67, at 4 (Church Decl. ¶ 10). This information was belatedly offered after Miche Bag and some other Defendants initially represented that Romero and Cavaness had never been employees of Miche Bag. Docket Nos. 32, at 2 (¶ 7); 36-5, at 2 (¶ 4); 40-4, at 8(¶ 15). Plaintiffs do not accept Church's representations at face value; currently available evidence indicates that Romero and Cavaness were, inter alia, founders, officers, marketers, and official spokespersons for Miche Bag, and not merely simple employees of Miche Bag. Ballo 3d Decl. ¶¶ 13-14, 16, 18, 19-20, 23-26, 29-30, Ex. JJ; Wireman 2d Decl. ¶¶ 6-7, 9-13, 16-18, Ex. JJ. Plaintiffs also understand that Seegmiller was, inter alia, an investor, officer, and employee for Miche Bag who oversaw logistics associated with importation of the purses from China and shipment of the merchandise to distributors. Ballo 3d Decl. ¶ 17. Cavaness and Seegmiller served as, inter alia, officers and employees of Miche Bag, so their wrongful activities serve as independent grounds for imputation to Miche Bag based upon the same reasoning that applies to Romero herself.

[85] *Bennett v. Huish*, 155 P.3d 917, 931-32 (Utah Ct. App. 2007) (officer or director personally liable if they participated in fraudulent or tortious activity on behalf of corporation, and corporation is also liable); *Wardley Better Homes and Gardens v. Cannon*, 61 P.3d 1009, 1016-17 (Utah 2002) ("Knowledge can always be imputed to a corporation-even when used to determine a subjective mental state-because a corporation has no belief or intent independent of that of its officers and agents[]"; "[a]n agent does not cease to act within the course of his employment merely because he engages in a fraud upon a third person; it is of no consequence that he is deceiving the principal along with the third person"); *Shapiro, Berstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307-09 (2d Cir. 1963) (vicarious liability for infringing use of intellectual property); *Buckles v. Brides Club, Inc.*, 2010 WL 3190751 * 7 (D.Utah) (unpublished) (employer potentially liable for officer's tortious interference with another company's website, even though the misguided interference was unauthorized and harmful to employer's interests); *Bailey v. Diamond Int. Corp.*, 47 A.D.2d 363, 365, 367 (N.Y. Ct. App. 1975) (employees committing fraud could be personally liable even though acting for employer and inuring no personal benefit, and employer liable if it retained benefits from employee's fraud); *Smith v. Jordan*, 220 S.W.2d 481, 484 (Tx Ct. Civ. App. 1949) (if principal "retains the fruits of the deal, he ratifies all that has been done by the broker and is responsible for all fraudulent conduct, to the same extent as though he had committed such fraud in person").

*See also* 37 Am. Jur.2d Fraud and Deceit § 311 (citations omitted) ("The principal may be responsible for his or her agent's fraud or misrepresentation even though he or she may have personally received no benefits therefrom,[] and it is of no consequence that the agent acts entirely for his or her own purposes and commits a fraud solely for his or her own benefit, if it is within the actual or apparent scope of his employment.[] An agent that is acting in a capacity for

### 3)        Other Defendant Errors Regarding The Fraud Claim

Defendants admit "Plaintiffs' fraud claim includes various partnership-based allegations directed at Romero" but then erroneously assert that the "'sole basis of the fraud claim is that a defendant represented materials as his own'" and "the only allegations regarding the Company Defendants are that they assisted Romero in asserting ownership of the intellectual property in the Collection, kept those efforts secret from Plaintiffs, and 'cloud[ed] title to the Collection' by asserting ownership, thereby denying Plaintiffs their rights as co-authors of the Collection's copyrights."  Docket Nos. 98, at 9; *see also id.* at 12 ("Plaintiffs seek to vindicate through this claim spring directly from their alleged status as co-inventors").

In light of the explanation in this section II.C.1) to 2) about the conspiratorial fraud and the supporting allegations in relation to it, as well as the detailed overview of the factual allegations associated with the fraudulent acts and omissions as set forth in section I.A.5), *supra*, it is clear that the alleged fraud involves wrongful acts against Plaintiffs pertaining to, inter alia, the Partnership; contents of the Binder, including research, marketing plans, business plans, and consultative material, that did not involve copyright or patent material (and funds attributable to the same); harm to goodwill; improper withholding of test market results; misuse of a fiduciary relationship to Plaintiffs; and interference with other potential products besides the Collection per se.  These and numerous other acts and damages alleged implicate far more than mere efforts

---

both parties is not a defense to an action by one of them to hold the other responsible for the misrepresentations made by the agent."); 37 Am. Jur.2d Fraud and Deceit § 316 (citations omitted) ("The general rule that a principal is liable for the fraud and misrepresentation of an agent who is acting within the scope of his or her authority or employment[] is fully applicable to corporations.[] A corporation may be held liable for the fraud and deceit of its officers and agents acting within the scope of their corporate authority or employment,[] even though the wrongful act was ultra vires or in fraud of the corporation itself, and notwithstanding that the corporation did not authorize or concur in, or could not even be deemed to know of, the fraud.[] A corporation is not relieved from liability for the fraudulent acts of its officer within the apparent scope of his or her authority by the fact that the officer, in committing the fraud, is acting for his or her own benefit and the fact that the corporation does not profit by it.")

by Defendants to represent Collection "materials as [their] own," and the fraud claim is valid.

### D.     Claim Fifteen For Unjust Enrichment Is Adequately Pled In All Respects

The Miche Defendants challenge the unjust enrichment claim because the FAC "entirely fails to allege . . . that the Company Defendants had knowledge that Plaintiffs had conferred a benefit on them" and "there are no allegations that the Company Defendants knew Plaintiffs at all." Docket No. 98, at 6. Defendants are mistaken. The FAC clearly recites that all of the Defendants, not just Romero, "knew and should have known that Romero did not and could not have developed the Collection designs on her own," FAC ¶ 58, and sets forth that Defendants all knew what had happened but then exploited the contents of Plaintiffs' Binders—including marketing and business research, plans, and the like—without compensating the Plaintiffs.[86] Defendants thus knowingly derived an unjust benefit from Plaintiffs.

The Miche Defendants also challenge the unjust enrichment claim on the ground that "Plaintiffs' unjust enrichment claim contains no allegation that Plaintiffs lack an adequate remedy at law." Docket No. 98, at 6. They then backtrack by admitting that Plaintiffs did make such an allegation in FAC ¶¶ 78, 155 ("[a] remedy at law, although also necessary, cannot on its own afford full or adequate protection to Plaintiffs"). The Miche Defendants then beg their basic preemption argument by theorizing that Plaintiffs' paragraph 78 verbiage can be ignored because "such an allegation would be flatly inconsistent with Plaintiffs' assertions that they have rights to

---

[86] *E.g.* FAC ¶¶ 52 ("Defendants "all knowingly reached, enabled, assisted, perpetuated, and consummated a common ongoing scheme to harm and defraud Plaintiffs"; see also FAC ¶¶ 53-55, 58, 63, 67-70, 155-56, 165. In addition, as explained in the facts description in section I.A.5), *supra*, and in section II.C.2), *supra*, the Plaintiffs believe the evidence already available shows that all of the Defendants had actual knowledge about Plaintiffs, the true origin of the Binder content, and so on; be that as it may, it is a disputed issue of fact for the jury to decide. In addition, the other Defendants besides Romero have continued to unjustly enrich themselves even after being directly notified by Plaintiffs about Romero's problematic acts and omissions. Furthermore, the FAC alleges that Defendants were notified about the Plaintiffs' concerns on July 28, 2011, but have nonetheless persisted in their ongoing pattern of wrongful, fraudulent, tortious, unjust, and conspiratorial conduct. *E.g.* FAC ¶¶ 60, 67-70, 74, 77-78, 83, 102.

Miche's intellectual property under the Copyright and Patent Acts." *Id.*

As fully discussed in section II.B., Plaintiffs' claim for unjust enrichment is proper, non-duplicative, not preempted, and regularly allowed in a case of this kind involving product research, marketing plans, creation of physical drawings and artifacts, physical labor, investment, and consultative expertise.[87]  *E.g.* FAC 4, 156-57.  Furthermore, Plaintiffs have properly invoked the FRCP 8(d)(2-3) principle that Plaintiffs can plead "in the alternative," *see* FAC Prayer 1.  In other words, Plaintiffs can properly plead unjust enrichment to support recovery in the event that the Court should, arguendo, deny any and all potential legal theories for any partially overlapping recovery of the same damages.  It is, arguendo, possible as a hypothetical example for the Court to find that Plaintiffs are entitled to no patents, no copyrights, and no recovery for fraud or tortious interference, but that Plaintiffs are still entitled to unjust enrichment for the other aforementioned benefits unfairly and knowingly retained by the Defendants without just compensation.  Accordingly, the unjust enrichment claim should not be disturbed.

### E.    Claim Sixteen For Tortious Interference Is Properly Pled In All Respects

The Miche Defendants assert "Plaintiffs have not alleged any actual existing or

---

[87] *Briarpatch Ltd., L.P.*, 373 F.3d at 305, 306-07; *Cyanamid VI*, 342 F.3d at 1304-06; *Sturdza*, 281 F.3d at 1305; *Rodime, PLC*, 174 F.3d at 1306; *Russo*, 550 F.3d at 1015-1016; *Cyanamid IV*, 196 F.3d at 1371-72; *Gates Rubber Co.*, 9 F.3d at 847; *Oddo*, 743 F.2d at 633, 633 n.2, 635; *Massachusetts Eye and Ear Infirmary*, 552 F.3d at 67; *Fenn*, 283 F.Supp.2d at 628-40; *Wood*, 589 F.Supp.2d at 1253-54; *Integrative Nutrition, Inc.*, 476 F.Supp.2d at 298; *Dorsey*, 304 F.Supp.2d at 863-67; *Asunto*, 132 F.Supp.2d at 451-53; *Howard*, 725 F.Supp. at 1578-79. Moreover, the FAC is replete with, inter alia, articulation of acts that do not include reproduction, adaptation, performance, distribution, or display; with articulation of claims that involve "an extra element, beyond mere copying, preparation of derivative works, performance, distribution or display"; with harm and requests for relief that are not merely limited to copying, preparation of derivative works, performance, distribution or display; and with aspects that have nothing to do with inventorship per se.  *See e.g.* FAC ¶¶ 4, 27, 31, 34, 48, 76, 78, 110, 118, 119, 120, 121, 126, 127, 129, 130, 132, 134, 135, 139, 140, 144, 145, 146, 147, 149, 151, 154, 156, 161, 162, 163, 166, 167; Prayers 1, 4, 7, 8, 9, 17, 18, 19, 20, 21, 24, 25.  Defendants are thus also in err when they assert that Plaintiffs' allegations are "essentially restating its prior claims relating to patents and copyrights[.]"  Docket No. 96, at 14.

prospective economic relations with which the Defendants could have interfered."[88]  Docket No. 98, at 7.  In point of fact, Plaintiffs can and do allege that Defendants tortuously interfered with several layers of Plaintiffs' economic relations simultaneously.[89]

The first layer of economic relations was the one between Lowry and Ellis (i.e. the relationship between Lowry and Lowry's economic and intellectual property benefactor) and also between both Plaintiffs and their existing network of professional artists.[90]  Plaintiffs are professional artists who had existing relationships as well as the prospective potential to make products based upon the Collection and other purses that were not part of the Collection.  From a technical and logistical standpoint, Plaintiffs did not (and do not) need the involvement of Romero or the other Defendants to enjoy the ability to make and sell a purse line using Utah purse makers.  However, due to the interference, manipulation, concealment, and deception of Romero and Romero's co-conspiring Defendants—including, for example, the legal obstruction, fiduciary manipulation, concealment of developments, falsification of intellectual property filings, concealment of test results, promulgation of false stories of product origin, misuse of the physical Binders (including the marketing plans, business plans, research, legal documents,

---

[88]  Defendants have observed that a claim for interference with economic relations in Utah requires "'(1) . . . the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff.'"  Docket No. 96, at 13 (citations omitted).  "A claim for interference with economic relations "protects both *existing* contractual relationships and *prospective* relationships . . . not yet reduced to a formal contract.'"  Id. (citations omitted, emphasis added).  "'One who intentionally and improperly interferes with another's *prospective* contractual relation . . . is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into *or continue* the prospective relation or (b) *preventing the other from acquiring or continuing the prospective relation*.'"  Docket No. 96, at 15 (citations omitted, emphasis added).

[89]  *See also* footnotes 26-27 and accompanying text, *supra.  See generally Leigh Furniture and Carpet Co. v. Isom*, 657 P.2d 293 (Utah 1982) (explaining elements of the tort in Utah).

[90]  *E.g.* FAC ¶¶ 18-19, 23, 30, 33, 35, 48, 52, 53, 77, 80-81, 83, 102-03, 166, Prayer 24.

Drawings, and other content therein) and numerous other acts[91]—Plaintiffs were (and are) artificially and improperly prevented from moving forward as originally contemplated.[92]

The second layer of economic relations involved the relationships between Plaintiffs and Romero herself, including, inter alia: a) the partnership relationship between Romero and Lowry, which incepted on the Spill Date and was never dissolved;[93] b) the fiduciary relationship Romero had toward Ellis to properly utilize the bequest by Ellis to Lowry and the Partnership, which incepted on the Spill Date and was never fulfilled;[94] c) the fiduciary relationship (including bailee relationship) Romero had toward both Ellis and Lowry to safely keep and properly use the physical Binders and the marketing plans, business plans, research, legal documents, Drawings, and other content therein;[95] and d) the fiduciary relationship Romero had as a co-author with respect to rendering a proper accounting to the Plaintiff co-authors.[96]  The FAC pleads that the other Defendants conspired with Romero to engage in legal obstruction, manipulation of Plaintiffs through improper manipulation of Romero's fiduciary relationship with Plaintiffs, concealment of developments relevant to the Partnership, assignments involving Romero that were directly adverse to the Partnership and Ellis' bequest, falsification of intellectual property filings, concealment of test results, promulgation of false stories of product origin, and numerous other improper acts recited in the FAC.[97]  As to this second layer of economic relationships only,

---

[91]  *E.g.* FAC ¶¶ 12-15, 52-56, 58-61, 63-66, 69-70, 73-74, 77, 141, 144-48, 163-64, 166, Appendices A-B; *In re S & D Foods, Inc.*, 144 B.R. 121, 158-67 (Bkrtcy D. Colo. 1992).

[92]  *E.g.* FAC ¶¶ 43, 70-72, 133, 146, 163, 166, Prayer 24; Lowry 3d Decl. ¶¶ 14-19, Ex. QQ.

[93]  *E.g.* FAC ¶¶ 12 19, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 39, 42, 43, 46, 47, 48, 50, 52, 53, 56, 63, 69, 71, 72, 103, 106, 110, 118, 119, 120, 134, 136, 139, 144, 147, 156, 161, 166.

[94]  *E.g.* FAC ¶¶ 12, 23 24 25 26, 27, 28, 30, 31, 42, 47, 50, 52, 53, 56, 63, 71, 72, 119, 120, 134, 145, 147, 156, 162, 163, 166.

[95]  *E.g.* FAC ¶¶ 4, 27, 68-69, 110, 118, 120, 121, 132, 147, 152-53, 161, 163.

[96]  *E.g.* FAC ¶¶ 13, 18-20, 29, 30, 53, 64, 94, 120, 136, 163, 166.

[97]  *E.g.*  FAC  ¶¶  12-15,  52-56,  58-61,  63-66,  69-70,  73-74,  77,  141,  144-48,  163-64,  166,

Romero herself is liable to Plaintiffs under theories related to Partnership, breach of fiduciary duty, negligence, breach of contract, fraud, unjust enrichment, and so on rather than tortious interference with the same.  However, as to this second layer of economic relationships, the remaining Defendants are liable for tortious interference with the existing and continuing economic relationships between Plaintiffs and Romero.  Defendants interfered and made it possible for Romero to violate Romero's existing economic relations with Plaintiffs in favor of Defendants' concealed conspiratorial arrangement to utilize Plaintiff's intellectual property, research, and consultative work product without proper consent or compensation to Plaintiffs.[98]

The third layer of existing and prospective economic relations speaks not only to the first "relations" element of tortious interference, but also to some of the "injury" caused as set forth in the third requirement for tortious interference.  Plaintiffs allege the Partnership extended from the Spill Date until the present time, without any dissolution or partition.[99]  Thus, for example, when Romero became aware of the potential 2008 Wal-Mart and Target opportunities for commercial exploitation of the Partnership Collection, Plans, research, and other consultative work product in the Binders, Romero breached her partnership and fiduciary obligations to the Partnership and Plaintiffs by declining bona fide prospective commercial opportunities without affording notice to Plaintiffs.  At the same time, Romero's co-conspiring Defendants interfered with the Partnership's potential economic relations with Wal-Mart and/or Target, in order for all of the Defendants to utilize Plaintiff's intellectual property, research, and consultative work product without proper notice, consent, or compensation to Plaintiffs.[100]

---

Appendices A-B.

[98] *E.g.* FAC ¶¶ 12-15, 52-56, 58-61, 63-66, 69-70, 73-74, 77, 141, 144-48, 163-64, 166, Appendices A-B; *see e.g. Klepper v. First Am. Bank*, 916 F.2d 337, 340 (6th Cir. 1990).

[99] *E.g.* FAC ¶¶ 12, 24, 27, 32, 41-43, 46, 48-49, 63, 72, 106.

[100] *E.g.* FAC ¶¶ 53, 120, 121, 129, 130, 134, 135, 140, 147, 149, 163, 167; Docket Nos. 31, at 6

With respect to damages, Plaintiffs assert, inter alia, that: a) Plaintiffs have lost time and opportunity with respect to clearing away the legal confusion and legal cloud on title placed upon the Collection and the Binders, vis-à-vis Plaintiffs' start of their own enterprise in Utah to sell the Collection and have some of the product manufactured in Utah; b) Plaintiffs have suffered harm and loss of value with respect to the Partnership and the value of the Partnership, including, inter alia, goodwill, intellectual property related to the Collection, the research and Plans in the Binder, and so forth; c) Plaintiffs have lost potential business and artistic opportunities, including without limitation potential opportunities to sell the Collection (and other non-Collection products, as well as potentially other consultative or artistic services as related to the Binder or otherwise), to Wal-Mart, Target, and various other parties who have conveyed commercial interest to the Defendants; and d) Defendants' actions ongoing continue to interfere with Plaintiffs' effort to start an independent purse company even at the present time.

The Miche Defendants also assert—just as they did in relation to the fraud and unjust enrichment claims—that Plaintiffs have failed to "allege knowledge on the part of the Company Defendants." Docket No. 98, at 7. Once again, that cannot be correct with respect to any Defendant, because the FAC clearly recites that all of the Defendants, not just Romero, "knew and should have known that Romero did not and could not have developed the Collection designs on her own," FAC ¶ 58, and sets forth that Defendants all knew what had happened but then exploited the contents of Plaintiffs' Binders—including marketing and business research, plans, and the like—without compensating the Plaintiffs or notifying Plaintiffs in connection with the business opportunities that Defendants were destroying and usurping for Defendants'

---

(¶ 6); 67, at 6 (Corbin Decl. ¶ 21); see also *In re S & D Foods, Inc.*, 144 B.R. at 158-67.

own purposes.[101] The Defendants conspired to "exploit[] Romero's fiduciary relationship with Plaintiffs in a manner calculated to keep Plaintiffs and the Partnership in a condition of reliance, confusion, and stasis" and to thus prevent Plaintiffs from competing with Defendants. FAC ¶ 55.

Finally, as already explained in section II.B., *supra*, tortious interference is *not* preempted and is specifically been allowed as a valid state claim alongside copyright and patent claims.

### F.     Rule 8 And Rule 41 Arguments Were Waived And Lack Substantive Merit

An initial observation must be made in relation to arguments appearing throughout the Defendants' respective filings[102] that are outside the ambit of FRCP 12 (b)(6).  Defendants and Plaintiffs expressly negotiated with regard to whether FRCP 8 would be revisited after Plaintiffs' responsive modifications, and stipulated with specific verbiage that such issues were waived in favor of each Defendant submitting only a filing in the nature of an answer or a motion resting on FRCP 12 (b)(6).  Witte 5th Decl. ¶ 33-38, Ex. NN.  Five days after all of the Defendants had completely failed to meet their filing deadline—either by obtaining the Court's timely permission for an extension and/or by filing any response to the First Amended Complaint before expiration of the normal deadline—the Court extended leniency to the defaulting Defendants by retroactively approving the stipulation without alteration.  Docket No. 93.  Notwithstanding this,

---

[101]  *E.g.* FAC ¶¶ 52 ("Defendants "all knowingly reached, enabled, assisted, perpetuated, and consummated a common ongoing scheme to harm and defraud Plaintiffs"; see also FAC ¶¶ 53-55, 58, 63, 67-70, 155-56, 165.  In addition, as explained  in the facts description in section I.A.5), *supra*, and in section II.C.2), *supra*, the Plaintiffs believe the evidence already available shows that all of the Defendants had actual knowledge about Plaintiffs, the true origin of the Binder content, and so on; be that as it may, it is a disputed issue of fact for the jury to decide. Furthermore, the FAC alleges that Defendants were notified about the Plaintiffs' concerns on July 28, 2011, but have nonetheless persisted in their ongoing pattern of wrongful, fraudulent, tortious, unjust, and conspiratorial conduct.  *E.g.* FAC ¶¶ 60, 67-70, 74, 77-78, 83, 102, 163, 167. As with many of the other state claims, the tortious interference claim provides a useful tool for preventing ongoing harm in the future as well as remedying harm already inflicted in the past.

*Bower v. Stein Eriksen Lodge Owners Ass'n*, 201 F.Supp.2d 1134, 1143 (D. Utah), is inapposite, as that case involved a *summary judgment* motion where the plaintiff had failed to furnish any evidence of defendant's discrete past intentional interference with a third party relationship.

[102]  *See e.g.* Docket Nos. 96, at 3, 8, 10-13; 98, at 2-4.

Defendants have now filed their present motions to assert the very FRCP 8 arguments they expressly stipulated not to include.  Defendants also ask the Court to adopt a draconian, ultra-technical approach penalizing Plaintiffs for perceived (de minimus and/or stylistic) flaws in the First Amended Complaint which, if present at all, would be immaterial and attributable to a) Defendants' own misconduct and b) Plaintiffs' observance of a deadline despite adversity.[103]

Respectfully, this Court should honor the terms of the stipulation and refuse any further arguments based upon FRCP 8 or other grounds not articulated in FRCP 12 (b)(6).

Assuming, arguendo and without waiver of the stipulation rights by Plaintiffs, that this Court decides to entertain any arguments based upon FRCP 8 or FRCP 41, notwithstanding the stipulation, Plaintiffs respectfully assert that the First Amended Complaint is technically adequate and substantially compliant in all respects.[104]  Defendants continue to demand ever

---

[103] As detailed elsewhere, Plaintiffs pieced together shortly before their own filing deadline for the First Amended Complaint that Defendants had spoliated and otherwise concealed numerous previously unknown copyrights and patents related to the Collection.  Since the deadline was looming too close for Plaintiffs to obtain advance Court leave for a filing extension, Plaintiffs and Plaintiffs' Counsel had to scramble at the last minute and throughout the weekend in order to comply with the Court's direction that they review and specifically articulate characteristics associated with each separate intellectual property registration.  This was all done in the midst of a once-in-a decade complete overhaul of the McCormick Barstow, LLP, computer operating system, which caused a variety of problems such as making the complaint slightly longer than in the previous format.  *Dunmore v. Dunmore*, 2012 WL 2857666 *3 (E.D. Cal.) (extra complaint page not penalized).  Plaintiffs' Counsel also ran into technical difficulties with ECF.  Plaintiffs nonetheless filed their First Amended Complaint by the applicable deadline.  Witte 5th Decl. ¶¶ 22-32, Ex. OO; Ballo 3d Decl. ¶¶ 4-12; Wireman 2d Decl. ¶ 22; Lowry 3d Decl. ¶¶ 4-12.

[104] As documented in Section II.B.1), *supra*, Plaintiffs completely re-drafted the First Amended Complaint to ensure that the various points identified by the Court were addressed; included, per the Court's direction, detailed information about all of the known individual Collection-related filings, even though doing so consumed a great deal of space Plaintiffs would have preferred to devote to other details; reluctantly deleted several causes of action solely to comply with the Court's length limitation; hewed to a "bare bones" approach that deferred a great deal of additional detail to "discovery" per the Court's admonition (*e.g.* Tr. 71:2); inserted numerous references to times, places, and dates throughout the document; and stripped the First Amended Complaint down to fifty pages before being forced to add a last-minute set of tables to set forth all of the Court-required information about the numerous recently-uncovered intellectual property filings concealed by Defendants.  The Appendices necessarily contain some definitions, disclaimers, and provisos, because otherwise Defendants would seek to impute various undesired and unintended interpretations to the content of the lists in the Appendices.

more details in relation to virtually every aspect of the FAC—including more dates,[105] recitation of ever more arcane legal phrases, and inclusion of more facts of every kind—even as they simultaneously insist that the length of the FAC be continuously reduced and that Plaintiffs should be disallowed to using a table to orderly list all of the intellectual property information Defendants themselves have identified as necessary.[106] Plaintiffs are willing to provide one hundred pages of complaint detail if allotted commensurate space, or fifty pages of detail in a fifty page complaint, but it is unreasonable[107] for Defendants to demand that one hundred pages

---

[105] Defendants' filings and oral arguments (*see* Docket Nos. 50; 52; 76-77) did not dispute Plaintiffs' observations—as made in Plaintiffs' filings and Plaintiffs' oral argument—that a pleading can set forth a period of time under certain circumstances that apply in this case. *E.g.* Docket Nos. 55, at 1, 1 n.1; 56, at 1, 1 n.1; Tr. 43:14-15 ("it is appropriate to plead a period of time and [Plaintiffs] have laid out cases that establish that"); s*ee also* ¶¶ FAC 52, 68-70 (pleading certain information and records are currently in the exclusive possession of Defendants; Defendant's scheme incepted on or about January 1, 2007 to February 28, 2008, and has operated as an ongoing scheme since that time); *Probert v. Clorox Co.*, 258 F.R.D. 491, 495 (D. Utah 2009) (in patent dispute, FRCP 9(b) standard satisfied by pleading "the time frame in which the alleged inequitable conduct occurred"); *see also Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 346-348, 348 n.2 (4th Cir. 2005); *Hodgson v. Virginia Baptist Hosp., Inc.*, 482 F.2d 821, 823-24 (4th Cir. 1973); *Finegan v. Myers*, 2009 WL 960780 *2-3 (N.D. Ind.); *In re Asbestos Cases*, 1990 WL 36790 *1-2, 4 (N.D. Ill.); *Jones v. United Gas Improvement Corp.*, 383 F.Supp. 420, 423 n.2 (E.D. Pa. 1975); *McKinzie v. Springfield City Water Co.*, 14 F.R.D. 503, 803 (W.D. Mo. 1953). Defendants' invocation of *Koch v. Koch*, 203 F.3d 1202, 1237 (10th Cir. 2000), is inapposite; in contrast to the FAC here, which has an extensive and explicit description of a fraudulent conspiracy, *Koch* involved a one-paragraph allegation of fraud that set forth an 18-year "time frame" which was not "sufficiently precise," utterly failed to "address intent or purpose," failed to set forth "any factual basis" for fraud, and failed to "identify any specific Defendant who made these alleged fraudulent . . . omissions[.]" *See Wachovia Bank v. Bank of Oklahoma*, 2006 WL 2934 (W.D. Okla.) (unpublished).

[106] *E.g.* Docket No. 95, at 2 of 3; Tr. 15:2-3; 16:19-25; 17:19-25; 46:1-10; 68:10-19 (seeking and requiring that each known patent be listed with information about the type of patent and the existing and alleged correct co-owner and co-inventor listings for each patent, along with an explanation about the basic "contribution" made by Plaintiffs).

[107] This is especially true given the fact that a) Miche Bag opted to spoliate its Website by destroying and concealing information about the shells as needed for copyright analysis; b) all of the Defendants elected to use the Hearing to reinforce a temporary misperception by the Court (and Plaintiffs) that only 27 items of intellectual property were likely to be in dispute, when Defendants were fully aware that other registrations were implicated; and c) all of the Defendants nonetheless pressed the Court for a shorter complaint, and, simultaneously, for inclusion in the FAC of details about each and every disputed intellectual property registration.

worth of detail be crammed into fifty pages of space.[108]

Similarly, Defendants cannot properly level factual arguments against the Plaintiffs and then insist that Plaintiffs be prohibited from offering rebuttal allegations and facts. Defendants have openly alleged that it was somehow suspicious for Ms. Ellis not to have more closely monitored and unilaterally detected Ms. Romero's surreptitious fraudulent scheme; Defendants posit that somehow there is a suspicious gap in the timeline and/or that Plaintiffs waived their rights in some unspecified way.[109] Contrary to the Miche Defendants' characterizations, Docket No. 98, at 3, Plaintiffs do not understand[110] the Court to have forbidden all mention[111] of the fact that for an extended period of time Ms. Ellis and her family were preoccupied with intensive medical care of Mr. Ellis when he had his face removed and eventually reconstructed as the result of a life threatening tumor pressed against his brain.[112] The engulfing family medical tragedy involving the dual tumor conditions of Lowry and her father is essential to understanding

---

[108] By way of comparison, Miche Bag filed a First Amended Complaint as plaintiff in *Miche Bag, LLC v. Be You, LLC*, Case No. 1:09-cv-14256-TLL-CEB (March 16, 2010). Miche Bag's straightforward infringement case involved only one defendant, two patents, three copyrights, four claims, and virtually no significant factual narrative to recite. Nevertheless, Miche's First Amended Complaint and its exhibits were 38 pages long and included 15 different prayers. *See Nagler v. Admiral Corp.*, 248 F.2d 319, 322, 324, 328 (2d Cir. 1957) ("practical[]" "alternatives" actual available for drafting complaint are part of the analysis for assessing its adequacy).

[109] *E.g.* Docket No. 96, at 4 (emphasis in original) (asserting there was "no alleged attempt by either Lowry or Ellis to communication with any of the defendants until more than *six years later*," a representation Plaintiffs now note is inaccurate in numerous different ways).

[110] If, arguendo, the Court somehow did mean to say that Plaintiffs were forbidden from any mention whatsoever of Mr. Ellis' severe medical condition, Plaintiffs apologize in advance and request an opportunity to re-file the FAC without the references and subject to Plaintiffs' objection as based upon the legal arguments set forth herein.

[111] As explained in section I.B.1), Plaintiffs' understanding was the Court wanted Complaint ¶ 56 excised because it contained an unnecessarily detailed description of Mr. Ellis' condition.

[112] As explained elsewhere, Ms. Lowry shares her father's susceptibility to tumors, and has had her own ongoing medical problems from as far back as 2002. As a fiduciary to both Plaintiffs, Romero was aware of, and exploited, the enhanced opportunity for fraud that the distracting situation presented. FAC ¶ 72; Tr. 5:14-18. Consistent with the classic Fraud Triangle formulation (i.e. fraud is typically characterized by opportunity, pressure, and rationalization), Romero and the other Defendants took advantage of Plaintiffs' vulnerability due to the illnesses.

what Plaintiffs were focused on during a period of time that Defendants have speciously identified to this Court as suspicious or legally significant in some way inimical to Plaintiffs' intellectual property rights.  Plaintiffs should not be prevented from mentioning in their own FAC, or in court generally, basic critical narrative events, circumstances, and evidence.[113]

Rule 8 and related rules are applied after taking into account practical considerations related to the complexity of the case and scope of the alleged activities involved; the access each party has to pertinent records and information; and other pragmatic factors.[114]  Courts typically do not require a plaintiff to plead all of the enumerable details associated with a complex ongoing financial scheme, or articulation of granular dates and details of fraudulently concealed transactions involving information and records held solely in possession of the Defendants.[115]

---

[113]   A defendant is not unfairly prejudiced merely because challenged evidence or factual allegations from the other party are contrary to the defendant's own view of the facts, or because there may be "damage to a defendant's case that results from the legitimate probative force of the evidence[.]"  *United States v. Schrock*, 855 F.2d 327, 335 (6th Cir. 1988).  A trial court "is not required to scrub the trial clean of all evidence that may have an emotional impact, where the evidence is 'part of the . . . narrative.'"  *United States v. Morales-Aldahondo*, 524 F.3d 115, 120 (1st Cir. 2008); *Simaan, Inc. v. BP Products N. Am.*, 395 F.Supp.2d 271, 278-80 (N.D.N.C. 2005) ("fraud . . . juries should see . . . evidence of all . . . maneuverings between the parties"); *Gateway Bottling, Inc. v. Dad's Rootbeer Co.*, 53 F.R.D. 585, 588 (W.D. Pa. 1971). Facts pertaining to the medical condition of a party or a party's family member are permissible to, inter alia, describe narrative events and impacts associated with disputed acts and omissions alleged in the litigation. *See e.g. Thompson v. Perkins*, 911 S.W.2d 582, 586 (Ark. 1995) (Trial court permissibly allowed party witness to testify that "at the time of the accident, his wife was in the vehicle with him, and that they were returning home from West Memphis, where his wife was being treated for cancer. . . . they had gone back several times for her checkups, and he was familiar with the intersection where the accident occurred"); *State v. Moore*, 440 S.E.2d 797, 804, 814 (N.C. 1994) (court did not err in allowing nurse to describe narrative facts that included medical techniques and equipment used for man with severe medical conditions, even though defendant asserted testimony was introduced to invoke jury sympathy for deceased's family).

[114]  *E.g. Monument Builders*, 891 F.2d at 1480-81, 1485 (also reversing trial court for imposing improper dismissal pursuant to FRCP 8(a)(2) and FRCP 12(b)(6)); *Rivendell Woods, Inc.*, 415 F.3d at 346-348, 348 n.2 (FRCP assessed "'on the basis of the nature of the action, the relief sought, and the respective positions of the parties in terms of the availability of information and a number of other pragmatic matters.'"); *Walling v. Black Diamond Coal Mining Co.*, 59 F.Supp. 348, 349-50 (W.D. Ky. 1943 ("defendants . . . must be presumed to have records on which they base the payments to employees. These records are in their hands.").

[115]   *E.g. Suntrust Mortg., Inc. v. Sharpe Mortg. Lending Serv. Of Ga., Inc.*, 20011 WL 6178221 * 3 n.2, 4 (E.D. Va.) ("the meticulous specificity that Sharpe would have this Court require of

Notwithstanding Defendants' entreaties, FRCP 8 and 41 are not meant to be used for dilatory delay or invoked in lieu of two-way discovery.  The *Twombly* standard is not intended to impose a de facto summary judgment standard prior to discovery.  The federal rules do not elevate contests of technical skill above the practical merits of the parties' case.[116]  Plaintiffs have implemented the Court's directives in good faith, presented adequate notice, and identified ample facts to demonstrate the potential merit of their claims.  Accordingly, and with respect, this litigation should be allowed to progress to discovery.

## III.   CONCLUSION

Plaintiffs respectfully request that Defendants' motion be denied and, further, that costs and fees be awarded to Plaintiffs for arguments levied in violation of the stipulation.[117]  Even if, arguendo, the existing recitations for this claim or any other aspect of the FAC were to be found technically inadequate, the purported deficiency(ies) could easily by cured by insertion of any additional recitations or verbiage Defendants might demand.  Thus, if the Court should somehow identify any deficiency(ies), Plaintiffs respectfully request (1) a list of specific deficiencies, (2) guidance about what alternative drafting approach will resolve the deficiencies, and (3) leave to amend and cure.[118]  With respect, it would be improper to grant dismissal of any FAC claim without an express, articulated finding that any effort after leave to cure would be futile.

---

SunTrust is simply not necessary at this stage of litigation" notwithstanding *Twombly*); *Simaan, Inc. v. BP Products N. Am.*, 395 F.Supp.2d at 278-80; *In re O.P.M. Leasing Serv., Inc. v. Ganz*, 21 B.R. 986, 992-93 (1982); *Stromillo v. Merril Lynch, Pierce, Fenner & Smith, Inc.*, 54 F.R.D. 396, 396-98 (E.D.N.Y. 1971).

[116]  *Perington Wholesale, Inc. v. Burger King*, 631 F.2d 1369, 1371-73 (10th Cir. 1979) (also stating FRCP 8(f) requires that "'all pleadings shall be so construed as to do substantial justice'" . . . The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive of the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits'"); *Wynder v. McMahon*, 360 F.3d 73, 74-75, 77-78 (2d Cir. 2004); *see also Davis v. Ruby Foods*, 269 F3rd 818, 819-20 (7th Cir. 2001).

[117]  *Stromillo*, 54 F.R.D. at 398.

[118]  *Simmons v. Abruzzo*, 49 F.3d 83, 85-88 (2d Cir. 1995).

Dated:  August 20, 2012                    McCORMICK, BARSTOW, SHEPPARD,
                                           WAYTE & CARRUTH LLP


                                    By:_____/s/ Daniel E. Witte_____
                                             Daniel Witte
                                          Attorney for Plaintiffs
                                        Emily Lowry and Kenna Ellis



2168021.1